## Auman *v.* Eash, Appellant.

Argued March 12, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Richard C. Angino,* with him *Hurwitz, Klein, Benjamin & Angino,* for appellant.

*Robert B. Lieberman,* with him *Melman, Gekas and Nicholas,* for appellee.

OPINION BY JACOBS, J., June 21, 1974:

This is an appeal from an order granting custody of 6-year-old Timothy Auman to his natural father, Joseph Auman. Appellant, George Eash, is the child's stepfather with whom Timothy resided for nearly 2 years prior to these proceedings. The hearing judge found both fathers were fit parents, but found the

natural father's right to custody of his child superior to that of an unrelated third person. We believe that the order of the lower court should not be disturbed.

Timothy's mother, Deborah, married Joseph Auman in March 1966 when she was only 16. Timothy, her only child, was born in October 1967. After a marriage filled with great unhappiness, the parents separated in April 1971 when Timothy was 3½ years old. A divorce was obtained and in May 1972 Deborah married George Eash. Timothy, who had always been in the custody of his mother, became strongly attached to Mr. Eash and thought of him as his father. In November 1973, when the boy was 6, Deborah was killed in a car accident and Joseph Auman, who had recently married his third wife, began to make efforts to regain custody of Timothy.

The testimony as it unfolded before the hearing judge portrayed George Eash as a loving father and model husband. He provided a good home for his family while they were all together and after his wife's death he made adequate arrangements for Timothy's care which included a large amount of time for the two to spend together. There appeared to be much love between the stepfather and son.

Joseph Auman was also shown as being able and willing to provide a satisfactory home for Timothy. He has a steady job which he has held for a long time and his apartment, though not as spacious as George Eash's mobile home where Timothy has resided, would accomodate another little boy. His new wife, who has two children of her own, expressed eagerness to care for Timothy. The major challenges to the lower court's award of custody to this father center on his suitability as a parent in view of his past conduct. Appellant points out that Joseph Auman has been married three times by the age of 29. His first two marriages ended disastrously and his third is of such recent vintage that

its future is unpredictable. His relationship with Deborah, Timothy's mother, was stormy and he is accused of having at times failed to adequately provide necessities for her and the child. After his divorce, he saw virtually nothing of Timothy, primarily because Deborah was emotionally distraught about their relationship and would not permit him to visit the child. He contributed nothing to Timothy's support after her remarriage.

The general rules of law controlling controversies in this area are clear. Of paramount concern is the welfare and best interests of the child, which includes consideration of his physical, intellectual, moral, and spiritual well-being. *Commonwealth ex rel. Holschuh v. Holland-Moritz*, 448 Pa. 437, 292 A.2d 380 (1972). Subject to this rule is the general principle that a parent is entitled to the custody of his natural children. This right as a natural parent, while not absolute, has been described by this Court as being so moving and cogent that as against a third party seeking custody it can be forfeited only by his conduct or other factors substantially affecting the child's welfare. *Commonwealth ex rel. Insalaco v. Delconte*, 201 Pa. Superior Ct. 354, 192 A.2d 750 (1963), *aff'd.*, 413 Pa. 221, 196 A.2d 353 (1964); *Commonwealth ex rel. Sabath v. Mendelson*, 187 Pa. Superior Ct. 73, 143 A.2d 665 (1958). The factors which would deprive a parent of his right must convincingly demonstrate that the child's permanent welfare would best be served by placing him in another's home and it is not consistent with his best interests for him to reside with his natural parent. *Snellgrose Adoption Case*, 432 Pa. 158, 247 A.2d 596 (1968); *Commonwealth ex rel. Shamenek v. Allen*, 179 Pa. Superior Ct. 169, 116 A.2d 336, *allocatur refused*, 179 Pa. Superior Ct. xxvi (1955).

The court below found no reason sufficiently compelling to mandate depriving this father of custody

of his child. Although the father was accused of misconduct and neglect to care for his previous family, testimony on the record supports the hearing judge's conclusion that his present circumstances are satisfactory and he is not unfit as a parent. His economic situation is stable, he is in regular attendance at church, and his activities in leading a Boy Scout group attest to his interest in children. If he has had no relationship with his son for nearly 2 years, it is not because he abandoned the child or his interest in him. Abandonment requires a showing of a settled purpose to relinquish all parental claim to a child which is ordinarily evidenced by words or acts revealing a positive intent to perform no parental duties and to exercise no further claim. *Austin Adoption Case,* 426 Pa. 441, 233 A.2d 526 (1967). Joseph Auman did not willingly give up his relationship with Timothy when he permitted Deborah to retain custody. The hearing Judge found, and it is supported by the evidence, that he made attempts to see Timothy but was prevented by Deborah. He resisted an attempt by George Eash to adopt his son. Immediately upon Deborah's death he sought to have Timothy returned to him. These facts do not show abandonment, nor do they show a lack of interest or concern in the child warranting refusal of custody to the father in the child's best interests.[1]

---

[1] *Cf. Commonwealth ex rel. Bailey v. Sumner,* 193 Pa. Superior Ct. 79, 163 A.2d 677 (1960), where a mother was denied custody of her adolescent child who resided with the father for 3 years before the father's death. The grandparents who had provided a home for the child for much of this period were granted custody after showing that the mother had not tried to see the child or remembered occasions such as birthdays or Christmas for 3 years, that her husband did not testify in court that he was willing to take on the child, and that the child expressed a preference to remain in the stable home situation of her grandparents. The facts of the present case do not reveal such a degree of parental neglect or such an uncertain environment in the parent's home.

The most difficult factor to be considered in determining this case is Timothy's relationship with his stepfather. At the age of 6, Timothy has resided with his stepfather for such a large proportion of his conscious years that he probably remembers little else that he ever considered home. As far as he is concerned, George Eash is his father. No criticism appeared in the testimony concerning this stepfather's adequacy to perform as a parent or his emotional attachment to Timothy. Removing a young boy from such a home environment and from such a relationship will undoubtedly be a wrench of significant proportions. However, these circumstances alone are not sufficient to deprive a natural parent of his child's custody absent a showing of compelling reasons which render inapplicable the usual rule. *Austin Adoption Case,* supra; *Commonwealth ex rel. Staunton v. Austin,* 209 Pa. Superior Ct. 187, 223 A.2d 892, *allocatur refused,* 209 Pa. Superior Ct. xxxix (1966). Courts are not privileged to select households in which to deposit children on the basis of personal preferences unguided by rules of law. Although the attachment of Timothy and George Eash touches sensitive human feelings, it has not been shown that Timothy's welfare requires that he stay in this home to the exclusion of his natural father.

Our review of the record satisfied us that the hearing judge gave careful consideration to all the evidence and properly weighed the interests of the child against the legal presumption favoring the natural parent. Although our scope of review in custody cases is broad, requiring independent examination of the evidence before reaching our conclusion, we cannot nullify the fact-finding function of the hearing judge. The hearing judge has had the opportunity to observe the parties and witnesses, and their credibility and the weight given their testimony can best be determined by him. *Commonwealth ex rel. Gifford v. Miller,* 213 Pa. Supe-

rior Ct. 269, 248 A.2d 63, *allocatur refused,* 213 Pa. Superior Ct. xl (1968). It is our opinion that after speaking with Timothy, hearing the parties and their witnesses, and weighing the continuing legal concern for the welfare of the child, the hearing judge in this case reached a conclusion supported by justice and law.

Order affirmed.

HOFFMAN, J., did not participate in the consideration or decision of this case.

———

DISSENTING OPINION BY SPAETH, J.:

In my judgment this difficult case has been decided, both here and below, on a most inadequate record.

I find little basis for the hearing judge's and the majority's confidence that the father is "able and willing to provide a satisfactory home for Timothy." He did not provide a satisfactory home for Timothy and his mother, nor for his first wife and child (whom he permitted to be adopted). While it is to be hoped that his present marriage will prove to be happy, whether that is likely cannot be determined from the record. When the hearing was held (January 3, 1974), he had been married less than five months. His wife's testimony was very brief and she did not describe the marriage; she did say she would "love to have" Timothy and had discussed the possibility with her husband. A neighbor and friend said the home was "exactly like mine, they keep it neat [and clean]," but most of her testimony concerned the father's past relationship with Timothy and this was also so of the testimony of the father's sister (who did not refer at all to the present marriage or home). Against this evidence is the testimony of Timothy's greatgrandmother, grandmother, grandfather, and a friend of Timothy's mother, and

while hardly disinterested, some of this testimony is most disquieting as regards the father's character.*

It appears to me that both the hearing judge, who decided the case from the bench, and this court have in effect accepted the father's testimony at face value. In a case such as this some independent inquiry should be made. The best procedure would be for the hearing judge to appoint counsel for Timothy. *Cf. In Re: Adoption of R. I.,* 455 Pa. 29, 312 A. 2d 601 (1973); *Stapleton v. Dauphin County Child Care Service,* 228 Pa. Superior Ct. 371, 324 A. 2d 562 (1974). At least there should be an impartial witness who has examined the respective homes; frequently a hearing judge will accomplish this through the good offices of a social service agency. There should also be some at least relatively impartial testimony regarding character, as for example by the father's and stepfather's respective ministers and civic and business associates; nor would

---

* For example: From the greatgrandmother's testimony: "Q. Did he ever indicate he was going to burn her hands? A. Did he. Did he. Sit and laugh. Q. Just answer the question, that's all. A. He took her hands and held them over the hot fire that the man that lived next door then came over and saved her and then she phoned, and cried, grandma please come and get me. Please come and get me. I couldn't go. I had no way to get down. Holding her beautiful hands over flames to burn them." If offered for the truth, this is hearsay; also, the greatgrandmother admitted she hated the father. There was, however, no rebuttal. From the grandmother's testimony: "There were time [sic] Debra called me and cried to me over the phone that she had no food in the home." From the grandfather's: ". . . she always called up crying. . . . I seen it many times, she'd come up to the house hungry." "The thing that upset me most was her crying all the time that Joe had beaten her up, coming up home telling me they had no food." The friend (she said she had been a friend of both the father and stepfather) said the "cupboards were frequently bare" and that she would give the mother supper and also her son's outgrown clothing for Timothy. There was no rebuttal to any of this testimony.

it be out of place to require both of them and also the father's wife to be examined by a psychologist or psychiatrist.*

Although great consideration is due a natural parent's interest in having his child, a presumption must never interfere with determining what is in fact in the child's best interests. *Commonwealth ex rel. Grillo v. Shuster,* 226 Pa. Superior Ct. 229, 312 A. 2d 58 (1973). Thus the tender years presumption is "merely the vehicle through which decision . . . may be reached where factual considerations do not otherwise dictate a different result." *Commonwealth ex rel. Parikh v. Parikh,* 449 Pa. 105, 109, 296 A. 2d 625, 627 (1972). There are many cases in which determination of the child's best interests has led to an award of custody to someone other than a parent. *See* cases cited in *Stapleton v. Dauphin County Child Care Service, supra* at n.7.

In the present case I believe there has been too much reliance on presumption and too little reliance on evidence. I do not mean to be unforgiving about the father's past unsuccessful marriages. Normally both parties to a divorce are at fault; and in any event, the father is entitled to overcome his past. *Cf. Commonwealth ex rel. Holschuh v. Holland-Moritz,* 448 Pa. 437, 292 A. 2d 380 (1972) (custody awarded mother who admitted having affairs with other men). Thus, I do not say the award of custody is wrong; I simply cannot tell. In some cases this uncertainty would dictate affirmance, but not here, where our responsibility is to exercise review "of the broadest type." *Commonwealth ex rel. Holschuh v. Holland-Moritz, supra* at 443, 292 A. 2d at 383. Upon such review, what appears is that

---

* Apart from the testimony by the greatgrandmother and other relatives, alluded to above, other parts of the record suggest the need for such inquiry. Under cross-examination the father admitted that at one time he had been a "fairly heavy" drinker, but said he had "[cut down a] whole lot."

the hearing judge has ordered Timothy taken from care criticized by no witness and praised by every witness who saw it,* and has placed him in a situation that may prove most unfortunate.

I would remand for further hearing.

CERCONE, J., joins in this opinion.

---

* Including the father's friend and neighbor, who said on cross-examination: "Q. Did you indicate to Mr. Eash that since he has been taking care of Timothy you noticed a big change in Timmy? A. Yes. Q. He seemed to be coming along real well, doing real well? A. Yes."