640 A.2d 926

**Max KARNER, Appellant,**

v.

**Lisa K. McMAHON, Appellee.**

Superior Court of Pennsylvania.

Argued Jan. 18, 1994.

Filed April 21, 1994.

John D. Conroy, Doylestown, for appellant.

Karen Olejarz, Doylestown, for appellee.

Before WIEAND, HUDOCK and SAYLOR, JJ.

HUDOCK, Judge:

Max Karner (Father) appeals from the order of the trial court awarding legal and primary physical custody to Patrick McMahon (Stepfather), while affording him partial custody. We affirm.

The facts were ably summarized by the trial court:

[Father] is 32 years of age and Lisa McMahon (hereinafter "Mother") is 30 years of age. [The parties were married in 1983.] Michael Karner was born August 6, 1983 and Andrew Karner was born May 2, 1986. At the time of the birth of the Children the parties lived in California and Father was in the Navy. In 1986 the family moved to South Carolina and in March, 1987, the parents separated. They were divorced in approximately January 1989 and Mother married Stepfather in March 1989.

Prior to the separation of the parties, the Children resided with both parents. When the parties separated, neither parent wished to have custody of or be responsible for the Children. Thus, for approximately eleven months, beginning shortly after the parties['] separation, the Children resided with Anthony and Gloria Brady, who were friends of the family. Toward the end of the time that the Children lived with the Bradys, Mr. Brady tried to give the Children to Father but Father did not want them. Nevertheless, Mr. Brady insisted and the Children stayed with Father for two days. Father then gave them to Mother for one day, who

then gave them back to the Bradys for another six weeks. The Children did eventually return to Mother's custody after Mr. Brady insisted that she take some responsibility for them. There was no further contact between the Bradys and Mother or Father until after Mother remarried in 1989. At that time, a relationship between the [Bradys], Mother and the Children was reestablished with the Bradys acting in the capacity of grandparents, taking the boys for camping weekends and engaging in other activities with them on a regular basis.

Stepfather began living with Mother a few months before their March, 1989 marriage. Mother was employed as a paramedic and engaged in extensive educational activities to advance herself in the paramedical field. These activities took most of her time. Therefore, Stepfather spent significant periods of time with the Children and assumed the role of primary caretaker from the time he moved in with Mother until present. Stepfather is in the Navy and used to have approximately sixty days per year when he is on a submarine. During those times he made arrangements for child care. Now, however, he is no longer required to do submarine duty. Except for his time on the submarine, Stepfather was with the Children virtually every day and primarily met their needs. Stepfather and Mother have a child, Kristin, who was born in March of 1990. Kristin has lived with Stepfather and the Children from her birth until present. The Children have a close relationship with their half-sister.

From shortly after the separation, until approximately June, 1991, Father did not see the Children on any regular basis, and periods between visits sometimes would last up to six months. However, around June, 1991, Father began seeing the Children on a regular basis, usually one overnight or day visit, although sometimes he was to have them two consecutive overnights. Stepfather had encouraged Father to see the Children more often but, despite this encouragement, Father did not make any extra effort to spend more time with the boys.

Father was to have the Children on the weekend of January 26, 1992. However, he returned the Children on Saturday, a day early, which was apparently a regular practice of Father. Father testified that Mother needed a babysitter (Father's words) for the Children and for Kristin for Sunday, since the Stepfather was on submarine duty at that time, but agreed to "babysit" so long as he would have the use of Mother's car. While Mother, Father, the two boys and Kristin were together in the car, they were involved in a tragic automobile accident in Charleston, South Carolina. As a result of this accident, Mother has suffered permanent injuries which have rendered her incompetent. One of the boys, Michael, had a severe closed head trauma which, after several months of hospitalization, has left him with some residual problems and concerns for his psychological well being. The other boy, Andrew, suffered a less severe closed head injury. Kristin suffered a severe open head injury which resulted in the removal of part of her brain and has left her with significant motor problems on the right side of her body. Father was not admitted to the hospital, but had some bruised ribs and a cut over his eye. He was, by far, the least injured in this accident. Father did not assume a decision-making role for the Children's medical care after this accident, either immediately or long term. Stepfather, who was given an emergency leave and arrived at the hospital shortly after the accident, began making medical decisions for the entire family. Father's contribution principally related to the issue of whether he could bring a law suit for his own injuries.

Andrew was released from the hospital approximately two weeks after the accident into the custody of Stepfather. Stepfather's mother came from Philadelphia to help care for Andrew. Michael was in the hospital for a longer period and eventually was transferred to the Seashore House at Childrens Hospital in Philadelphia for follow-up care. Father did not, even after the Children were released from the hospital, attempt to assume any custody. When asked why

he waited until Stepfather asked for custody Father replied: "I was going to file for custody despite the papers, but it was a matter of just the timing. I wanted to make sure that my boys were better, and that the liability that was inherent in the accident was met." (N.T., 1/4/93, p. 79).

While Michael was in the hospital in Charleston, and at Stepfather's request, Anthony Brady stayed with him at night, as Michael was waking up with night terrors. At the time, Stepfather was dividing his time between his critically ill wife and daughter and his stepchildren. Mr. Brady asked Father to stay with Michael at night. Father complied one time, but two other times when he was asked, he did not appear and offered no explanation as to why he would not stay with Michael.

Stepfather also investigated, after consultation with the doctors, as to the best place for treatment of the Children and his wife and a decision was made by Stepfather that the family should be moved to the Philadelphia area. Stepfather consulted with Father, and as Father testified, he did not oppose the move. Father left the decision to Stepfather. Along those lines, Stepfather obtained a transfer with the Navy to the Philadelphia area. Mother was eventually transferred to Moss Rehabilitation Hospital in Philadelphia and is presently in Leader Nursing Home. Mother's father indicated that to some extent she appears to know her surroundings. There appears to be some minimal improvement in Mother's condition but there is no indication that she will ever become competent or able to resume custody of these Children.

Michael was discharged from Childrens Hospital to Stepfather's care. Both Children have remained in the custody of Stepfather to date. Father saw the Children in Pennsylvania, with Stepfather's encouragement and cooperation, several times until the weekend of July 4, 1993. On that weekend Stepfather asked Father to sign papers giving him custody. As a result of that request, this litigation has commenced.

Trial Court Opinion, 9/21/93, at pp. 2–6.

Father raises the following issues on appeal:

1. DOES A STEPPARENT HAVE STANDING TO SEEK CUSTODY FROM A NATURAL PARENT?
2. CAN A NATURAL PARENT WHO IS FIT LOSE CUSTODY TO A STEPPARENT?
3. WHAT IS THE APPROPRIATE TEST TO BE APPLIED TO RESOLVE A CUSTODY DISPUTE BETWEEN A PARENT AND A STEPPARENT?
4. DID THE COURT MAKE A FINDING THAT FATHER WAS UNFIT?
5. ARE THE FINDINGS OF THE COURT ALL SUPPORTED BY THE RECORD BELOW?
6. DID THE COURT PREPARE A DETAILED COMPREHENSIVE OPINION WITH REASONS UNDERLYING ITS DECISION WHICH COMPRISES A THOROUGH ANALYSIS OF THE WHOLE RECORD?
7. DID THE COURT PRESENT A CONFLICT BY ISSUING TWO OPINIONS STATING ITS REASONS— THE FIRST NOT MENTIONING FATHER AT ALL AS A FACTOR AND THE SECOND STATING NEGATIVE THINGS ABOUT HIM?

Father's Brief at p. 2. While Father raised the above seven issues, his argument is presented in twenty separate divisions which sometimes do not correspond to any issue raised. Although this violation of Pa.R.A.P. 2119(a), 42 Pa.C.S., has made review more cumbersome, we will nevertheless review the merits of the above issues. *See generally, Commonwealth v. Melvin*, 378 Pa.Super. 59, 548 A.2d 275 (1988), *alloc. den.*, 522 Pa. 588, 561 A.2d 741 (1989) (failure to address each of the issues presented for consideration separately in argument section of brief did not prevent this Court from reviewing merits).

■ Father first claims that Stepfather lacked standing to seek custody of Michael and Andrew. As this Court has recently stated:

Custody disputes between parties, other than parent versus parent, are characterized as "third party" disputes. [*In re Custody of Hernandez*,] 249 Pa.Super. 274, 376 A.2d 648

(1977). "Absent a prima facie right to custody, a third party lacks standing to seek custody as against the natural parent." *Rosado v. Diaz,* 425 Pa.Super. 155, 624 A.2d 193 (1993) [.] This is so because a parent's prima facie right to custody should not be subject to challenge without a clear and convincing showing that the child is not receiving proper parental care. This may properly be done through a dependency proceeding. *Gradwell v. Strausser,* [416 Pa.Super. 118, 610 A.2d 999 (1992) ]. Thus, the appropriate manner for a "third party" to obtain custody of a child is through a dependency proceeding. *Id.*

One exception exists to the above stated principle, that is where there is proof that a party stands in loco parentis to the child.

> The phrase 'in loco parentis' refers to a person who puts himself[/herself] in the situation of assuming the obligation incident to the parental relationship without going through the formality of a legal adoption. The status of 'in loco parentis' embodies two ideas: first, the assumption of a parental status, and second, the discharge of parental duties.

*Rosado v. Diaz,* 425 Pa.Super[.] at 161, 624 A.2d at 196, *citing Commonwealth ex rel. Morgan v. Smith,* 429 Pa. 561, 241 A.2d 531, 533 (1968).

*Van Coutren v. Wells,* 430 Pa.Super. 212, 215–216, 633 A.2d 1214, 1215–16 (1993). The rights and obligations arising out of the *in loco parentis* relationship are exactly the same as those arising between parent and child. *Gradwell v. Strausser,* 416 Pa.Super. 118, 610 A.2d 999 (1992).

In response to this issue, the trial court, in its 1925(a) opinion, stated that the record is replete with evidence that Stepfather has acted, and continues to act, *"in loco parentis"* for Michael and Andrew. Upon an independent review of the record, we agree with the conclusion of the trial court that Stepfather has assumed primary parental responsibility for the children since 1989 to the present. Thus, it is clear that Stepfather has standing to seek custody of Michael and Andrew.

We are unpersuaded by Father's several claims that this conclusion is in error. First, citing *Gradwell v. Strausser, supra,* Father claims that a third party cannot place himself *in loco parentis* status in defiance of the parents' wishes and the parent/child relationship. However, there is no evidence of such defiance on Stepfather's part in the present record. Father next cites *Creeks v. Creeks,* 422 Pa.Super. 432, 619 A.2d 754 (1993), for the proposition that Mother's custodial "interest" must be determined by the terms of the custody agreement which was part of the divorce decree of Mother and Father. Father contends that, because the agreement was not modified, the only conclusion that could be reached is that they intended to retain custody themselves and not to have Stepfather act *in loco parentis.* Father also claims that mere presence in the household with the children does not bestow any special status upon Stepfather or permit standing. *Weber v. Weber,* 362 Pa.Super. 262, 524 A.2d 498 (1987), *alloc. granted,* 515 Pa. 624, 531 A.2d 431 (1987). We note that *Creeks* did not involve a custody agreement, but rather, a marital settlement agreement. Moreover, in *Weber* this Court determined that an adult daughter who was not living with her parents lacked standing to seek partial custody of her minor sister who still lived with the parents and who was prohibited by them from visiting her outside their home. The case does not discuss the status of *in loco parentis.* Finally, we are unpersuaded by Father's claim that the one instance where Stepfather prevented him from seeing the children should defeat the latter's *in loco parentis* status. The record is clear that this was an isolated incident and, *even after the incident,* Stepfather has encouraged Father to visit the children.

Father next queries whether a natural parent who is fit can lose custody to a stepparent. As shall be discussed below, a finding of fitness is not the pivotal issue in parent versus non-parent disputes. This brings us to Father's next issue. He asks what is the appropriate test to be applied to resolve a custody dispute between a parent and a third party, i.e., stepparent. The answer is found in the following lan-

guage of this Court in *In re Custody of Hernandez*, 249 Pa.Super. 274, 376 A.2d 648 (1977):

> When the judge is hearing a dispute between the parents, or a parent, and a third party, the manner of inquiry is more complex [than that used in custody disputes between parents]. The question still is, What is in the child's best interest? However, the parties do not start out even; the parents have a "prima facie right to custody," which will be forfeited only if "convincing reasons" appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the parents' side. What the judge must do, therefore, is first, hear all evidence relevant to the child's best interest, and then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side.

*Hernandez,* at 286, 376 A.2d at 654 (footnote omitted). This test was adopted by our Supreme Court in *Ellerbe v. Hooks,* 490 Pa. 363, 416 A.2d 512 (1980). Stated differently, in seeking custody, the non-parent bears the burden of persuasion and the burden of production, and the non-parent's burden is a heavy one. *Albright v. Commonwealth ex rel. Fetters,* 491 Pa. 320, 421 A.2d 157 (1980). *Albright* also refined the test cited above by explaining that the term "prima facie right" of a natural parent is not a property right, that is, "that parenthood alone would necessarily defeat the claim of custody of a non-parent." *Albright,* at 325–26, 421 A.2d at 160. Thus the *Hernandez* standard, as adopted and refined by our Supreme Court, "was intended to emphasize the importance of the parental relationship, yet at the same time permit the hearing court to award custody to the third party where the best interests of the child will be clearly served by such a decision." *Id.*

█ Father next questions whether the trial court made a finding that he was unfit. While Father asserts that the answer is unclear based on the record, upon review, we find that the trial court neither made such an explicit finding nor

was required to do so. Rather, the natural parent's fitness is but one of the factors to be considered. As stated by our Supreme Court, making the unfitness of a parent the pivotal issue

> ... tends to focus the inquiry on the respective rights of the contesting parties whereas the real issue is the best interest of the children involved. Restated, the standard in this area is not to be construed as precluding a custody award to a non-parent, absent a demonstration of the parent's dereliction. We again emphasize that the standard seeks only to stress the importance of parenthood as a factor in determining the best interests of the child. However, other factors which have significant impact on the well being of the child can justify a finding in favor of the non-parent, even though the parent has not been shown to have been unfit.

*Albright*, at 328, 421 A.2d at 161. Upon review, we find that the trial court did consider Father's fitness as a parent but only as a factor in determining the best interest of the children.

Father cites *Ellerbe v. Hooks, supra,* and *Zummo v. Zummo*, 394 Pa.Super. 30, 574 A.2d 1130 (1990), for the proposition that the parent-child relationship should not be interfered with without some showing of harm. These cases do not stand for that proposition; rather, as already stated, *Ellerbe* adopted the standard this Court established in *In re Hernandez, supra.* Our plurality decision in *Zummo* involved a custody dispute between two parents as to the father's constitutional right to take his children to religious services "contrary to the Jewish faith" during periods of lawful custody or visitation. It is in this context that we held that such restrictions on father could only be justified if the party seeking the restriction demonstrates by competent evidence that the belief or practice of the party to be restricted actually presents a substantial threat of present or future physical or emotional harm.

Father also cites *Burke v. Pope*, 366 Pa.Super. 488, 531 A.2d 782 (1987), *alloc. den.*, 520 Pa. 570, 549 A.2d 131 (1988), for the proposition that "because of a natural parent's constitutional rights, the court in *Burke* at 787 indicated that only 'unfitness'

and 'abandonment' override the parent's prima facie right to custody." Father's Brief at p. 18. Father misreads *Burke*. In that case, this Court found that the trial court erred in basing its decision on some findings of fact that were not supported by the record and relied too heavily on the "psychological parent doctrine." No such errors or overemphasis occurred in the present case. In *Burke*, the trial court equated the "psychological parent doctrine" with unfitness and abandonment as factors that can override the parents *prima facie* right to custody. When this same language was used by this Court, however, it was only a reiteration and rejection of the language and reasoning of the trial court. The *Burke* court did no more than recognize that this Court has previously determined that the "psychological parent doctrine" cannot be a determinative factor in custody disputes. *See In re Donna W.*, 325 Pa.Super. 39, 472 A.2d 635 (1984) (*en banc*). However, psychiatric considerations are important, and should be considered along with many other factors. *Id.*

■ Additionally, Father's reliance on *In re Rinker*, 180 Pa.Super. 143, 117 A.2d 780 (1955), and *In re J.W.*, 396 Pa.Super. 379, 578 A.2d 952 (1990), for the proposition that a child cannot be placed with a non-parent unless there is an absolute necessity to do so, and for the proposition that natural parents have a constitutional right to custody of their children, is misplaced; these cases were decided under the Juvenile Act which, unlike the present case, involve custody disputes between the parent and state and require a stricter standard of proof before a child is taken from a parent's custody.[1] *See In re Hernandez, supra.* Finally, Father claims that a parent's right to custody as against a non-parent cannot be defeated by application of the "best interests of the child" test. Father is simply wrong; the fact that the best interests of the child is the paramount consideration is so

---

[1]. Father also cites *Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975), for the proposition that a father has a constitutionally protected right to the custody of the children he has sired and raised. While this may be true, if anything is clear from the record, it is the fact that Father cannot be said to have raised Michael and Andrew.

beyond peradventure that no further citation or discussion is needed. Indeed, even the rights of natural parents are subordinate to the child's best interest. *Constant A. v. Paul C.A.*, 344 Pa.Super. 49, 496 A.2d 1 (1985).

■ Father next asks whether the findings of the trial court are supported by the record. The standard of review applied by an appellate court to a child custody order is of the broadest type; an appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the Court accept a finding that is not supported by competent evidence. *McMillen v. McMillen*, 529 Pa. 198, 602 A.2d 845 (1992). While the standard is broad, it does not vest an appellate court with the duty or privilege of making its own independent determination, that is, nullify the fact-finding function of the trial court. *Id.* An appellate court may not interfere with the trial court's factual conclusions unless they are unreasonable in view of the trial court's factual findings and thus represent a gross abuse of discretion. *Id.*

Of course our paramount concern in child custody cases is the best interest of the child. *Commonwealth ex rel. Pierce v. Pierce*, 493 Pa. 292, 426 A.2d 555 (1981). In the present case, the trial court concluded that it would be in the best interest of Michael and Andrew if Stepfather was to be awarded custody. Before so concluding, the trial court considered the fact that at the beginning of the litigation Father testified regarding his stability by emphasizing his employment history and his various residences in South Carolina, yet, by the time of the final hearing, he indicated that he was in the process of moving to Connecticut and that he would be living there in his grandmother's house and working for his uncle's construction company. The trial court also noted that Father admitted that he told a friend in South Carolina that the insurance company had settled with his children and the amount of the settlement. The trial court also noted that various witnesses testified that Father had expressed interest in the money that the children had already received and potentially will receive because of the accident. The trial court then noted the

Stepfather's testimony that he believed the money was totally for the children and should be saved for their education.

The trial court interviewed the children individually. It noted that both of them considered Stepfather to be their real father. While the children realized that Father is their natural father, they refer to him as "Daddy Max." The trial court also noted that Doctor Rabinovich, a child psychiatrist, testified on behalf of Stepfather. Because he did not interview Father, the trial court assigned no weight to any recommendations he made as to who would be the better custodian of the children. However, because Dr. Rabinovich is also a medical doctor who is familiar in dealing with children who have received head traumas and in dealing with issues such as behavior problems, the trial court accepted his testimony that Michael should have continued counselling and should continue to be monitored by Childrens Hospital due to his head injury. Dr. Rabinovich also opined that the children have gone through both physiological and psychological trauma as a result of the accident, have essentially suffered the loss of their mother, and their little sister is severely injured. Thus, according to Dr. Rabinovich, it would further traumatize the children if they were to be removed from the person they view as their father.

Mother's parents and the Bradys all testified in support of Stepfather and corroborated his role as primary caretaker of the children and Father's lack of interaction with the children. On his part, Father, aside from his own testimony, presented as witnesses his grandmother and uncle with regard to the arrangements he has made to live with his children in Connecticut should he be awarded custody. He also presented the depositions of friends and former colleagues from South Carolina.

The trial court concluded that the testimony presented established that Stepfather has been very attentive in meeting the educational and emotional needs of the children, including the special needs that they currently have and may develop in the future because of the accident. This finding is amply supported by the testimony of several witnesses, as well as the

medical testimony provided by Dr. Rabinovich. The trial court chose to believe the testimony of Stepfather and Dr. Rabinovich that the children are not completely "well," as so characterized by Father, and, upon review, we find that such a factual conclusion is not unreasonable and does not, therefore, represent a gross abuse of discretion.

Based upon the record before us, we also cannot conclude that the trial court abused its discretion in determining that Stepfather would provide a more stable environment for the children. As testified by several witnesses, Stepfather has, for at least the last five years, provided an environment in which the children have flourished. Such stability is even more important when both children are still dealing with the residual effects of the tragic accident. *See Jones v. Stone*, 343 Pa.Super. 416, 495 A.2d 205 (1985) (importance of stability even more pressing because of the child's speech and behavioral problems). On the contrary, Father has never had custody of the children during this same time period for more than two days. He has divorced for the second time and has changed jobs several times. At the time of the final hearing in this case, Father was moving to Connecticut to live with his grandmother and work for his uncle. While he testified as to the accommodations for the boys there, the fact remains that the stability of that environment is unknown. *See Snarski v. Krincek*, 372 Pa.Super. 58, 538 A.2d 1348 (1988) (where a parent's past reveals character traits that undermine the ability or willingness of that parent to provide for his child, and in the absence of evidence that those traits have somehow changed so as to produce new parenting abilities and concerns, this Court can conclude that the risk that the past will be repeated in the future justifies an award of custody to a third party who has never indicated an inability or unwillingness to care for the children).

Finally, we cannot conclude that the trial court abused its discretion in considering the children's relationship with their half-sister and potential relationship with Mother. It is well-settled in the law that, absent compelling reasons, siblings should be raised together. *Cyran v. Cyran*, 389 Pa.Super.

128, 566 A.2d 878 (1989).  This is true of natural siblings as well as half siblings.  *Albright, supra.*  Contrary to Father's assertion, Mother's father testified that she does appear to recognize Michael and Andrew, and he has witnessed some improvement in her ability to communicate.

Father raises several instances where he claims the trial court's factual findings are not supported by the record.  The majority of these claims involve conflicting testimony and the weight that the trial court gave to such testimony.  As this Court has often noted, "the hearing judge is in a far superior position to determine matters of credibility, and to evaluate the attitude and sincerity of the witnesses."  *In re Arnold,* 286 Pa.Super. 171, 174–75, 428 A.2d 627, 629 (1981) (*citing Jones v. Kniess,* 249 Pa.Super. 134, 375 A.2d 795 (1977)).  After a thorough review of the record, we conclude that the trial court did not abuse its discretion in finding that Father's *prima facie* right to custody had been overcome by convincing reasons which prove it is in the best interests of Michael and Andrew to remain in the custody of Stepfather.[2]

Order affirmed.

---

**2.**  Father's final two issues involve the trial court's opinions.  Contrary to his first assertion, we perceive no conflict created by the issuance of the two opinions.  To enable this Court to exercise its independent judgment in custody cases, it is the duty of the trial court to make a complete record.  *Garrity v. Garrity,* 268 Pa.Super. 217, 407 A.2d 1323 (1979).  We find that the trial court in the present case was cognizant of this duty and gave the parties every opportunity to present testimony and/or depositions of witnesses from different states.  The trial court must also file a comprehensive opinion which makes factual findings and explains its analysis and reasoning in making its determination.  *Garrity, supra.*  Given the completeness of the record before us, we find the trial court's opinions to be adequate.  Thus, we need not remand for a more comprehensive opinion.  *See generally, Commonwealth ex rel. Husack v. Husack,* 273 Pa.Super. 192, 417 A.2d 233 (1979).