# In re Adoption of S.M.D.

C.P. of Chester County, no. A00-0056.

*Ronald F. Brien,* for petitioner.
*Lawrence J. Persick,* for respondent.
*Lauren G. Buchanan,* for child.

ENDY, *S.J.,* October 2, 2000—Jennifer and Ryan had a non-marital relationship in the early 1990s that produced one child, Shane. Still in their teens, their relationship ended eight months after Shane's birth. They never shared a household or lived as an intact family. Two years later, Jennifer met Charles, a machinist several years her senior. They began cohabiting in August of 1993 and married the following year. Charles has shared legal custody of his two children from a previous marriage.

Ryan maintained regular visitation with Shane on an informal basis for several years. In Shane's fourth year,

however, Ryan reports that Jennifer refused him further contact with the child without a court order. Ryan pursued his rights in court and obtained an order granting him shared legal custody with visitation every other weekend.

Ryan, now 27, married Stacey in 1995. They have one child together, Alicia. Ryan is a long-distance hauler who has held at least seven jobs in the last nine years. He does not have health insurance at present and has never provided health care coverage to Shane.

Ryan admits that his irregular working hours and frequent absences from home impaired his ability to meet the terms of his court-ordered visitation, although he denies ever missing a scheduled visit.[1] He insists that he would always telephone Jennifer if he were going to be late. Ryan claims Jennifer habitually refused to accommodate his requests for substitute visitation when conflicts arose between his work schedule and custodial time with Shane. Not surprisingly, Charles has a different recollection. Charles remembers Ryan failed to appear many times for his scheduled visitation, leaving Charles and Jennifer the task of explaining Ryan's absence to his anxious son. Charles maintains that Jennifer offered Ryan flexibility in visitation to no avail.

---

1. Ryan explained that he had little leverage in those days when negotiating for the terms and conditions of his employment because he did not possess his own truck. However, despite acquiring his own truck several years ago, Ryan continues to accept employment that entails unpredictable hours and prolonged weekly absences from home. Ryan asserted that he intends to find less demanding, more family-friendly employment in consideration of Shane's return, but at this time he has no firm prospects towards this end.

Beyond his four visitation days per month and occasional vacation with the child, Ryan did not involve himself in Shane's life. It was Charles who immersed himself in the day to day responsibilities of childrearing. Charles changed Shane's diapers, fed and bathed Shane, and tucked him into bed each night. Charles took Shane to the doctor and cared for Shane whenever he was sick. When Shane entered elementary school, it was Charles who attended parent-teacher conferences, sporting events, and Shane's other scholastic and extracurricular activities. Charles even coached some of Shane's team sports. Ryan appeared one time at Shane's kindergarten back-to-school night, but nothing else. Ryan blamed the school for failing to provide him with notice of Shane's progress and activities. He claims that he sent letters to the school requesting information about Shane's curriculum and grades but he never received any response. In the four-plus years that Shane has been enrolled in elementary school, Ryan admits that he never took any additional steps, such as personally appearing at the school, to rectify the situation.

In the late 1990s, the relationship between the parties grew increasingly tense. Charles described inconsistent visitation between Ryan and Shane and mounting support arrears. Ryan disagreed, although he did admit to falling behind in support for a month or two whenever he switched jobs. The parties did concur about the conflict between Jennifer and Ryan at visitation. Custody transfers would erupt into heated exchanges, leading to police intervention on one occasion. Father's Day 1999 would prove the last time Ryan was to visit with, or speak to, Shane for the next 14 months.

Ryan does not dispute the characterization that he has a pervasive passivity to his personality. He alleged that he did not try to contact Shane during the summer of 1999 because he wished to avoid a confrontation with Shane's mother. To his credit, he did send Shane a birthday card. Coincidentally, however, during this period Ryan was negotiating a surrender of his parental rights in exchange for his discharge from financial liability for Shane. Ryan signed a "consent of child's natural father, [Ryan], to the voluntary relinquishment of all his parental rights to his son, [Shane]." Therein, Ryan set forth his belief that "it is in the best interests of my son . . . to be with his mother and stepfather without any further interference from me." Although not in the statutorily-prescribed form, this document memorialized Ryan's acquiescence in the termination of his relationship with his son in consideration for forgiveness of support arrears. Ryan did not see Shane, call him, explain to Shane his decision, inquire after his welfare, nor even say goodbye following the execution of his consent. He simply disappeared from Shane's life.

Charles acknowledges that he and Jennifer did not act quickly upon Ryan's consent. He explained that they did not feel pressured to initiate proceedings immediately, believing instead that they had unlimited time. Charles stated that he and Jennifer decided they would begin Shane's adoption at the time of their planned family vacation in July of 2000.

Tragically, Shane lost his mother on June 14, 2000 when she died suddenly of a ruptured aneurysm at the age of 28. At Charles' request, Ryan did not attend the funeral, but did send Shane flowers. On June 22, 2000, one week after Jennifer's death, Charles filed a petition

to confirm Ryan's consent to Shane's adoption. We remanded the petition for defects, including the statutory nonconformity of Ryan's consent. Around this time, Ryan approached Charles for visitation with Shane, which Charles refused. Ryan then informed Charles that he no longer consented to Shane's adoption and demanded immediate and permanent custody of the child. Charles responded by filing a petition for involuntary termination of parental rights on July 14, 2000. Ryan countersued for custody of Shane on July 20, 2000. Ryan's complaint for custody has been deferred pending resolution of Charles' petition for involuntary termination of parental rights.

Preliminarily, we find that Charles has in loco parentis status to pursue a termination of Ryan's parental rights. In custody disputes, stepparents are treated as third parties vis-à-vis birth parents. *Bupp v. Bupp,* 718 A.2d 1278, 1281 (Pa. Super. 1998) (custody awarded to mother's ex-husband, an unrelated third party); *Karner v. McMahon,* 433 Pa. Super. 290, 640 A.2d 926 (1994) (stepfather held to have in loco parentis status in custody proceeding).

"The phrase 'in loco parentis' refers to a person who puts himself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of 'in loco parentis' embodies two ideas; first, the assumption of a parental status, and, second, the discharge of parental duties." *Bupp v. Bupp,* 718 A.2d 1278, 1281 (Pa. Super. 1998) (quoting *Commonwealth ex rel. Morgan v. Smith,* 429 Pa. 561, 565, 241 A.2d 531, 533 (1968)).

"An important factor in determining whether a third party has standing is whether the third party lived with the child and the natural parent in a family setting, irrespective of its traditional or nontraditional composition, and developed a relationship with the child as a result of the participation and acquiescence of the natural parent." *Bupp v. Bupp,* 718 A.2d 1278, 1281 (Pa. Super. 1998).

Charles, who married Shane's birth mother, and cared for, sacrificed for, and raised Shane for seven years, has clearly attained in loco parentis status. There is no authority to support the proposition that a stepparent loses either his stepparent status or his standing in loco parentis upon the death of the birth parent/spouse. As a step-relation, Charles is not required to file a report of intention to adopt. 23 Pa.C.S. §2531. Finally, it is not Pennsylvania law that a birth parent automatically prevails against third parties in custody matters, particularly where there is evidence that the birth parent has been derelict in fulfilling his parental role. *Charles v. Stehlik,* 560 Pa. 334, 744 A.2d 1255 (2000), *cert. denied,* 530 U.S. 1243, 120 S.Ct. 2689, 147 L.Ed.2d 961 (2000).[2]

In proceedings for the involuntary termination of parental rights, the petitioner bears the burden of estab-

---

2. The matter at bar is easily distinguished from the 1974 Superior Court case, *Auman v. Eash,* 228 Pa. Super. 242, 323 A.2d 94 (1974). In *Auman,* the trial court awarded, and the Superior Court affirmed, custody of a child to his birth father instead of his stepfather, with whom the child had been living. *Id.* The court based its decision in large part upon a finding that the birth father had not abandoned his child. *Id.* Unlike the birth father in *Auman,* Ryan expressly set forth his intention and desire to sever his relationship with Shane, in anticipation of a financial reward, and concurrently unilaterally terminated all contact with the child for more than a year.

lishing the statutory requirements by clear and convincing evidence. *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re E.M.,* 533 Pa. 115, 620 A.2d 481 (1993); *In re Adoption of Dale A. II,* 453 Pa. Super. 106, 683 A.2d 297 (1996); *Commonwealth v. Arnold,* 445 Pa. Super. 384, 665 A.2d 836 (1995); *In re E.S.M.,* 424 Pa. Super. 296, 622 A.2d 388 (1993). Section 2511(a)(1) of the Adoption Act, 23 Pa.C.S. §2101 et seq., provides for termination of parental rights where "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. §2511(a)(1). Failure to perform parental duties for the prescribed period will, alone, justify termination of parental rights; it is not necessary to also establish a settled purpose or intent to relinquish a parental claim. *Adoption of Baby Boy A. v. Catholic Social Services of Diocese of Harrisburg, Pennsylvania Inc.,* 512 Pa. 517, 517 A.2d 1244 (1986); *In re W.M. III,* 482 Pa. 123, 393 A.2d 410 (1978) (analyzing the requirements of 1 P.S. §311, now 23 Pa.C.S. §2511(a)(1)); *In re Burns,* 474 Pa. 615, 379 A.2d 535 (1977) (also discussing 1 P.S. §311, now 23 Pa.C.S. §2511(a)(1)).

However, a parent who fails to perform parental duties for the requisite statutory period does not automatically forfeit his or her parental rights; rather the court must look to the totality of the circumstances to determine whether the termination is appropriate. *In re K.C.W.,* 456 Pa. Super. 1, 689 A.2d 294 (1997); *Commonwealth v. Arnold,* 445 Pa. Super. 384, 665 A.2d 836 (1995); *Adoption of M.S.,* 445 Pa. Super. 177, 664 A.2d 1370

(1995); *In re E.S.M.,* 424 Pa. Super. 296, 622 A.2d 388 (1993). The trial court must measure the parent's performance in light of what would be expected of any individual under similar circumstances. *In re V.E.,* 417 Pa. Super. 68, 611 A.2d 1267 (1992).

Parental duties encompass a wide range of responsibilities beyond mere financial obligations. *Matter of Adoption of David C.,* 479 Pa. 1, 387 A.2d 804 (1978). A parent must affirmatively demonstrate love, protection and concern for his or her child. *Commonwealth v. Arnold,* 445 Pa. Super. 384, 665 A.2d 836 (1995). A parent must not yield to every problem, *In re Adoption of Dale A. II,* 453 Pa. Super. 106, 683 A.2d 297 (1996), but must exhibit reasonable firmness in overcoming obstacles placed in the path of the parent-child relationship. *In re K.C.W.,* 456 Pa. Super. 1, 689 A.2d 294 (1997). A parent has a continuing duty to love, protect and support his or her children and to maintain communication and association with them even after he or she has been separated from them. *In re V.E.,* 417 Pa. Super. 68, 611 A.2d 1267 (1992). A parent is required to exert him- or herself to take and maintain a place of importance in the child's life. *In re Adoption of M.M.,* 492 Pa. 457, 424 A.2d 1280 (1981) (discussing 1 P.S. §311, now 23 Pa.C.S. §2511(a)(1)).

The question at bar is whether Ryan has accomplished an abandonment of Shane within the meaning of 23 Pa.C.S. §2511(a)(1). Abandonment means "the parent has acquiesced in a termination of the close relationship normally existing between parent and child and permit[ted] the assumption by others of complete parental responsibilities." *Adoption of Spangler,* 61 Berks L.J. 162, 165 (1969). See also, *In re Rutz Adoption Case,* 50

Lacka. Jur. 25, 27 (1949). Although entailing more than mere neglect, *Snellgrose Adoption Case,* 425 Pa. 258, 262, 228 A.2d 764, 766 (1967); *Petition of Diffenderfer,* 39 Northamp. 173, 176-77 (1969), it does not necessarily imply the complete cessation of concern for the child's interests. *Hookey Adoption Case,* 419 Pa. 583, 589, 215 A.2d 860, 863 (1966); *In re Adoption of Aldinger,* 70 York Leg. Rec. 69, 72 (1956); *Adoption of Hillman,* 38 Erie 152, 158 (1955); *Adoption of Conlon,* 53 Lacka. Jur. 65, 68 (1952).

Ryan's motivation for seeking Shane's custody has been described as sincere. It has even been suggested that Ryan could provide a good home for Shane. Nevertheless, considering the totality of the circumstances, and measuring Ryan's behavior in light of what would be expected of a similarly situated parent, we find Ryan's conduct toward Shane meets the statutory threshold for termination of parental rights.

Commencing more than one year before the filing of this petition, Ryan evidenced a settled purpose of relinquishing his parental claim to Shane and refused or failed to perform his parental duties. With the exception of occasional vacations through 1998, Ryan has never become involved in Shane's life beyond his two-day biweekly visitations. He did not maintain contact with Shane's school or attend any of Shane's academic or extracurricular activities. Ryan left it to Charles to take the initiative and guide Shane through the trials and tribulations of his tender years.

Ryan stopped visiting with Shane in June 1999. Around the same time, he also stopped supporting Shane financially and emotionally. In exchange for release from future liability and the discharge of his support arrears,

which had accumulated to $750.59 by September 30, 1999, Ryan signed a consent to the termination of his parental rights to Shane. He then dropped from the child's life without even the courtesy of an explanation or farewell.

Ryan has had nothing to do with Shane for more than a year, expressing not even the slightest interest in the child's welfare until the death of Shane's mother and the initiation of adoption proceedings. See *In re Adoption of Toner,* 27 Leh. L.J. 88 (1957) (termination decreed where father had no contact and expressed no interest in his child for 11 and one-half months). Ryan was content to allow another man to rear his child because of his strained relationship with the child's mother. Rather than exercise reasonable firmness to conquer obstacles to his relationship with Shane, Ryan capitulated, abdicating his parental role without equivocation. He did not strive to maintain a place of importance in Shane's life. Yet now, impelled by the death of Shane's mother, Ryan asks this court to sever Shane from the only source of security and unconditional love he knows, thank Charles for his time, and deliver Shane into the custody of an individual who would sacrifice his filial bond for economic convenience.

Abandonment "is not an ambulatory thing, the legal effects of which a delinquent parent may dissipate at will by the expression of a desire for the return of the discarded child." *Matter of Adoption of David C.,* 479 Pa. 1, 17, 387 A.2d 804, 811 (1978) (quoting *Davies Adoption Case,* 353 Pa. 579, 587, 46 A.2d 252, 256 (1946)); *Petition of Diffenderfer,* 39 Northamp. 173, 177 (1969); *Adoption of Ornstein,* 12 Bucks L. Rep. 595, 601 (1962); *Adoption of Reese,* 63 Lacka. Jur. 193, 197 (1962); *Adop-*

*tion of Fuller,* 54 Lacka. Jur. 37, 40 (1953). Although it is true that under certain circumstances a repentant birth parent may retrieve his or her parental rights, such as when it would benefit the child's welfare, *Davies Adoption Case,* 353 Pa. 579, 587, 46 A.2d 252, 256 (1946); *Adoption of Kelly,* 32 Northumb. L.J. 62 (1960); *Adoption of Hillman,* 38 Erie L.J. 152, 156 (1955), "when following an abandonment new ties have been formed and a new station in life assumed by the child," it may be unjust to deny legal sanction to the new conditions at the caprice of the errant birth parent and in such case the abandonment will be held irrevocable. *Petition of Keich,* 58 D.&C. 61, 66, 8 Monroe Leg. Rep. 85, 42 Sch. Leg. Rec. 99, 103 (1947); *Adoption of Heffuer,* 39 Berks L.J. 91, 92 (1946); *Adoption of Ogurcak,* 35 Berks L.J. 127, 129 (1943). See also, *Davies Adoption Case,* 353 Pa. 579, 588, 46 A.2d 252, 257 (1946).

"If a [parent] renounces ownership over the most treasured possession that can ever come into [his] days on earth, if [he] gives up the most precious gem in the diadem of [his] life for a period of time which establishes conclusively [his] renouncement of ownership, [he] cannot complain if that gem appears in the crown of happiness of another person or persons able and ready to assume the responsibilities which the [parent] has foresworn." *Austin Adoption Case,* 426 Pa. 441, 443, 233 A.2d 526, 527 (1967).

We find these maxims applicable here. Ryan's sudden change of heart towards Shane upon the death of Shane's mother is simply a case of "too little too late." With respect to Shane, Ryan seems motivated more by some perceived duty incident to biology than by a fatherly

desire to reunite with his son. "Parenthood is not a mere biological status, or passive state of mind which claims and declines to relinquish ownership of the child. It is an active occupation, calling for constant, affirmative demonstration of parental love, protection and concern." *Matter of Kapcsos,* 468 Pa. 50, 57, 360 A.2d 174, 177 (1976) (quoting *Appeal of Diane B.,* 456 Pa. 429, 433, 321 A.2d 618, 620 (1974)). Cf. *Battle Adoption Case,* 456 Pa. 553, 321 A.2d 622 (1974) (mother's abandonment of child not erased by mother's subsequent two-year period of custody).

Fortunately, Shane does not need to rely on charity to assure his well-being. He has a number of caring adults in his life, chief among them Charles, his stepfather, whose love, knowledge about, concern and passion for the child radiated throughout his testimony and demeanor on the stand.

We recognize that, by all accounts, Ryan is an adequate husband and father to his wife and their child. However, this does not negate the fact that he has made some very poor choices in connection with his relationship with his firstborn, choices which have led to his prolonged and absolute physical and emotional estrangement from the child. Ryan's overwhelming apathy towards Shane since June 1999 satisfies the statutory prerequisites for abandonment, and his eleventh-hour change of heart will not persuade this court to disturb the security and trust that has developed between Shane and his stepfather, Charles, in Ryan's absence.

"Parental rights may not be preserved by complete indifference to the daily needs of a child or by merely waiting for some more suitable financial circumstance

or convenient time for the performance of parental duties and responsibilities (while others adequately provide the child with [his] immediate and continuing physical and emotional needs). The parental obligation is a positive duty and requires affirmative performance which may not be delayed beyond the statutory period by the parent if the parental right is not to be forfeited." *Matter of Adoption of David C.,* 479 Pa. 1, 12, 387 A.2d 804, 809 (1978) (quoting *Smith Adoption Case,* 412 Pa. 501, 505, 194 A.2d 919, 922 (1963)). See also, *In re Burns,* 474 Pa. 615, 624, 379 A.2d 535, 540 (1977) (A child's need for love, protection, guidance and support "cannot be met by a merely passive interest in the development of the child.").

Charles has never wavered in fulfilling Shane's parental needs and Shane has thrived in his care, even in the face of his recent devastating loss. We find Shane's needs and welfare will be best promoted by terminating Ryan's parental rights and continuing Charles' custody of the child pending the consummation of Shane's adoption by his stepfather.

## ORDER

And now, October 2, 2000, upon consideration of the within petition and after hearing had thereon:

The court, being satisfied as to the truth of the facts set forth in the petition, finds that the adoptee's birth father, Ryan, has forfeited his parental rights in the adoptee, Shane, and further finds that it best serves Shane's needs and welfare to grant the petition, and it is hereby ordered, adjudged and decreed that all parental rights of Ryan in respect to Shane are terminated forever, and

custody of Shane is hereby awarded to his stepfather, Charles, and the child may now be adopted without further consent of, or notice to, the birth father, Ryan.

If no exceptions are filed within 10 days hereof, this decree shall become the final order of the court.