**Joey M. BUPP, Jr., Appellee,**

v.

**Amy K. BUPP and Brandon Leik, Appellants.**

Superior Court of Pennsylvania.

Submitted Sept. 23, 1998.
Filed Oct. 19, 1998.

Andrew B. Brown, York, for appellants.

Brooks K. Pomper, York, for appellee.

Before JOHNSON, HUDOCK and HESTER, JJ.

HUDOCK, Judge:

Amy K. Bupp ("Mother") appeals from the trial court's order awarding partial physical custody of her daughter Summer Breeze Bupp to Appellee Joey M. Bupp, Jr. ("Bupp"), an unrelated third-party. For the reasons which follow, we affirm in part, reverse in part, and remand for proceedings consistent with this Opinion.

Mother and Bupp are the parents of a minor child Leah E. Bupp, who was born on September 5, 1991. On July 10, 1992, Mother and Bupp married. The parties separated in September 1993 and were divorced in March 1994. In June 1995, Mother and Bupp resumed their relationship and began to again reside together. On September 5, 1995, Mother gave birth to Summer Breeze Bupp. Bupp attended and participated in the birth of the child, including the severing of the umbilical cord. While in the hospital, Bupp aided Mother in naming the child and in completing the documentation necessary for the issuing of the birth certificate, which reflected Appellant Brandon Leik [1] (Leik) as the natural father.

---

1. Although Leik is identified by the parties as an Appellant in this appeal, the record reveals that Leik did not file an appeal nor has he filed a brief in the within appeal.

One month following the birth of Summer, Mother filed a support action in the Court of Common Pleas of York County against Leik. Paternity was challenged and Human Leukocyte Antigen ("HLA") testing was performed confirming Leik as the natural father of Summer. Accordingly, an order of support was entered. Thereafter, Leik had no contact with Summer until January 1997.

Subsequent to Summer's birth, Mother, Bupp, Leah and Summer lived together as a family unit, with Summer referring to Bupp as "Daddy". At the beginning of September 1996, Mother and Bupp encountered difficulties and ended their relationship. Consequently, Bupp moved from the residence. Following the separation, Bupp continued an ongoing relationship with his natural daughter Leah, but did not see Summer until mid-October 1996. From mid-October 1996 through November 1996 Leah and Summer spent every other weekend and two days during the week with Bupp. At the end of November, Mother ceased all visitation by Bupp with Summer, with the exception of four hours on Christmas Day 1996. Bupp has not spent any time with Summer since Christmas 1996.

On December 20, 1996, Bupp filed a Petition for Custody of his natural daughter, Leah. On January 6, 1997, the court entered a custody order that awarded shared legal and physical custody of Leah to Mother and Bupp.

In January 1997, Mother contacted Leik, relative to her intention of having a will drafted, and in particular, to receive his acquiescence to being named guardian for Summer in the event of Mother's death. Leik consented and began to visit Summer approximately three times a week at Mother's residence. Leik also calls Summer one to two times per week on the days he is unable to visit or work requires him to be out of town. Summer now knows Leik as "Daddy."

On May 16, 1997, Bupp filed a petition for partial physical custody of Summer. Mother filed preliminary objections to the petition asserting that Bupp lacked standing to proceed with a petition for partial custody. Subsequently, Bupp filed an answer arguing that he has status to bring a suit for custody as a party *in loco parentis*. The court conducted an evidentiary hearing on the issue of standing and the merits of the petition for partial physical custody on December 4, 1997. On December 16, 1997, the trial court entered an order finding that Bupp had standing to pursue partial physical custody of Summer and awarded him one weekend per month, to be exercised during a weekend that Bupp exercises his rights of custody with his natural daughter, Leah. The trial court, in its two-page opinion, reasoned as follows:

Step-father[2] had lived and cared for Summer Breeze for the first year of her life. Furthermore, Step-father has exercised parental responsibilities with regard to Summer Breeze and has shown his desire to remain a significant part of her life.

For the reasons set forth above, Step-father is granted standing to pursue custody of Summer Breeze. This exercise of rights is to occur one weekend a month when he exercises his rights of custody with regard to Leah....

Trial Court Opinion, 12/16/97, at 2. On January 14, 1998, Mother filed a timely appeal from this order. Subsequently, Mother was ordered to file a concise statement of matters complained of on appeal, which was filed on February 10, 1998. *See* Pa.R.A.P.1925(b). The trial court, on February 17, 1998, filed its Rule 1925(a) statement adopting the reasoning for its custody determination as found in its opinion and order of December 16, 1997. The court further stated, "[Bupp] was granted visitation[3] because the Court be-

---

**2.** The trial court incorrectly refers to Bupp as "step-father" in its opinion. A step-father is "[t]he husband of one's mother by virtue of a marriage subsequent to that of which the person spoken of is the offspring." *Black's Law Dictionary,* 1268 (5th ed.1979). Because Bupp was not married to Mother at the time of Summer's birth, or at any time thereafter, Bupp was not a step-father to Summer.

**3.** We note that although the trial court states that it has granted visitation, it has, in fact, awarded partial custody to Bupp. Visitation is "the right to visit a child. The term does not include the right to remove a child from the custodial parent's control." 23 Pa.C.S.A. § 5302. Partial custody is "the right to take possession of a child away from the custodial parent for a certain period of time." *Id.*

lieved such visitation would be best for the child based on the relationship between [Bupp] and the child." Trial Court Opinion, 2/13/98, at 1–2.

■ Preliminarily, we note that our paramount concern in child custody cases is the best interest of the child. *McMillen v. McMillen*, 529 Pa. 198, 202, 602 A.2d 845, 846 (1992). Our standard of review in such cases has been summarized as follows:

> The scope of review of an appellate court reviewing a child custody order is of the broadest type; the appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it.... However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination.... Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*Kaneski v. Kaneski*, 413 Pa.Super. 173, 604 A.2d 1075, 1077 (1992) (citations omitted). Likewise, this broad power of review is not:

> intended to mean that an appellate court is free to nullify the fact-finding function of the hearing judge. It is a principle which runs through all our cases that the credibility of witnesses and the weight to be given to their testimony by reason of their character, intelligence, and knowledge of the subject can best be determined by the judge before whom they appear.... Only where we are constrained to hold that there was a gross abuse of discretion should an appellate court interfere with the decisions of the hearing judge.

*Rosenberg v. Rosenberg*, 350 Pa.Super. 268, 504 A.2d 350, 351–352 (1986) (citations omitted). Keeping these standards in mind, we will now address Mother's claims on appeal.

Mother asks this Court to consider the following issues:

1. Does [Bupp] lack standing to pursue rights of partial physical custody?

2. Assuming that [Bupp] does have standing to seek rights of partial physical custody, is it in the child's best interests [sic] to provide any rights of partial physical custody to [Bupp]?

Mother's Brief at 5.

■ It is well established that persons other than natural parents are third parties for purposes of custody controversies. *Tracey L. v. Mattye F.*, 446 Pa.Super. 281, 666 A.2d 734, 735 (1995); *Cardamone v. Elshoff*, 442 Pa.Super. 263, 659 A.2d 575, 579–80 (1995); *Gradwell v. Strausser*, 416 Pa.Super. 118, 610 A.2d 999, 1001 (1992). Courts have highly scrutinized principles of standing to protect the interest of the court system in assuring that actions are litigated by proper parties and to prevent intrusion and interference into the family domain by those who are strangers, however well-meaning. *J.A.L. v. E.P.H.*, 453 Pa.Super. 78, 682 A.2d 1314, 1318–19 (1996). Thus, third parties will only be found to have standing by our Court when the third party has shown a prima facie right to custody. *Silfies v. Webster*, 713 A.2d 639, 643 (Pa.Super.1998). A prima facie right to custody may be established by a third party's conduct, i.e., when the third party has stood *in loco parentis* to the child for whom the third party is seeking custody. *Id.*

■ The well settled definition of *in loco parentis* is set forth as follows:

> The phrase 'in loco parentis' refers to a person who puts himself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of 'in loco parentis' embodies two ideas; first, the assumption of a parental status, and, second, the discharge of parental duties.

*Commonwealth ex. rel. Morgan v. Smith*, 429 Pa. 561, 565, 241 A.2d 531, 533 (1968). An important factor in determining whether a third party has standing is whether the third party lived with the child and the natural parent in a family setting, irrespective of its traditional or nontraditional composition, and developed a relationship with the child as a result of the participation and acquiescence of the natural parent. *J.A.L. v. E.P.H.*, 682 A.2d at 1321. Moreover, "where only limited

custody rights are sought, the limited nature of the intrusion into the biological family must be considered in deciding whether standing has been made out." *Id.*

In reviewing the record before us, it is apparent that there is sufficient evidence from both Mother and Bupp to indicate that, from the time of Summer's birth, Mother encouraged Bupp to assume, and Bupp performed, the duties of a parent. Bupp testified that during the year he lived with Mother, he helped raise, feed, and diaper Summer. N.T., 12/4/97, at 7–8. He provided guidance to her, played with her, and treated and considered her as a daughter, no different than his natural daughter, Leah. *Id.* at 7, 8, 11. Mother did not refute this testimony, in fact, she concedes that she invited Bupp to act as father to Summer and acknowledged that the child, during Bupp's residence with her, referred to Bupp as "Daddy". *Id.* at 25–26, 31, 33. Mother further stated that the parties experienced turmoil when Bupp initially hesitated to take on the responsibilities of father to Summer. *Id.* at 25–26.

■■■■ Mother, however, now argues that Bupp should not be afforded *in loco parentis* standing because he lived with the child for a period of only one year. She suggests that if this Court grants standing to Bupp, a paramour, Mother will risk, if she has any relationships over the course of the child's minority, that each paramour may gain standing to seek rights of partial custody. Mother gives the example that, should she live with three different men for one year periods over the course of the next few years, each paramour would be able to petition the court for partial custody of the child for one weekend per month, leaving no time for Mother on the weekends with her child. Mother's hypothetical is not only extreme but it is further flawed in two respects. First, Mother assumes that each paramour will take on the parental status necessary for standing. Secondly, she presumes that the paramour will establish that partial custody will be in the best interest of the child under the standards applicable to third parties. "A finding of a prima facie right sufficient to establish standing does not affect that party's evidentiary burden: in order to be granted full or partial custody, he or she must still establish that such would be in the best

interest of the child under the standards applicable to third parties." *J.A.L. v. E.P.H.*, 682 A.2d at 1319. Mother has the ability to control and foster third-party relationships with her child. If Mother chooses to cultivate and encourage a third party to assume parental obligations and discharge parental duties toward her daughter, simply because Mother and the third party have differences which result in separation, Mother cannot eradicate the relationship which had developed between the third party and the child.

■■■■ We hold that the evidence of record in this matter is sufficient to establish that Bupp stood *in loco parentis* to the child and, thus, has standing to seek partial custody.

■■■■ Mother's remaining issue deals with the court's award of partial custody of Summer to Bupp. Our review of the record reveals that the evidence at the hearing did not address whether it would be in the best interests of this child to have continuing contacts with Bupp. The testimony at the hearing reflected primarily on the issues of whether Bupp had standing to pursue his petition for partial custody, the parties' relationships with the child, and their personal feelings toward a continuing relationship of the child with Bupp. Mother indicated that she believed that the child at this point would only remember Bupp if he were in the company of her other daughter, Leah. N.T., *supra*, at 31. The trial judge erroneously equated standing with the right of custody, as evidenced by her opinion. The trial judge did not refer to any factual findings to support an award of partial custody other than the facts that established standing. The award of standing to Bupp merely gives him the right to bring a custody action relative to Summer. It in no way implicates the ultimate merit of the case. *Kellogg v. Kellogg*, 435 Pa.Super. 581, 646 A.2d 1246, 1250 n. 5 (1994).

In the context of a custody case a trial court must ensure that as full and complete a record as possible is created when a decision as important as the welfare of a child is at issue.... As we have cautioned the lower courts time and again, in order to assess the best interests and general

welfare of the child or children, it is the duty of the trial judge to make the fullest possible inquiry in custody actions....

*Moore v. Moore,* 535 Pa. 18, 26–27, 634 A.2d 163, 167 (1993) (citations omitted). Accordingly, we find it necessary to reverse the trial court on this issue and remand for a hearing to determine if it is in the best interest of this child to have continuing contact with Bupp.[4]

Affirmed in part, reversed in part, and remanded for proceedings consistent with this Opinion. Jurisdiction relinquished.

---

**4.** We again note that the standard applicable in assessing Bupp's claim as against Mother and Leik, the natural parents, remains the standard and burden applicable for third parties in custody actions. *J.A.L. v. E.P.H., supra.*