## Michael L. v. Hilary W.-S.

C.P. of Dauphin County, no. 947 CV 2002.

*Edward J. Minnagh,* for plaintiff.
*Kenneth A. Wise,* for defendant.

TURGEON, *J.,* November 25, 2002—Hilary W.-S. appeals from a July 16, 2002 custody order, permitting her former live-in boyfriend, Michael L., to maintain visitation with her son, C.M. This opinion is written in support of that order. Pa.R.A.P. 1925(b), 42 Pa.C.S.

## PROCEDURAL BACKGROUND

On February 26, 2002, Michael filed a complaint seeking partial physical custody/visitation of Hilary's son, C.M., born July 22, 1992, and partial legal and physical custody of Hilary's daughter, A.L., born December 15, 1996. Michael is A.L.'s biological father but not C.M.'s. C.M.'s biological father has never been a presence in his

life. The parties previously lived together between the spring of 1996 and February 1999. Following separation, Michael maintained partial physical custody of C.M. and A.L., usually on alternating weekends, and some vacations and holidays. This arrangement continued until February 24, 2002, when Hilary denied him access to C.M.

At an April 22, 2002 custody conciliation conference, Hilary agreed that Michael should have joint legal and physical custody of their daughter A.L., but opposed any further relationship between Michael and C.M. Michael argued he stood in loco parentis. Following a custody hearing, I granted Hilary sole legal and physical custody of C.M., and granted Michael visitation rights on alternating weekends and other times "as C.M. wishes." Hilary has appealed from the grant of visitation.

## FACTUAL BACKGROUND

At the hearing to determine Michael's standing and potential right to custody/visitation, I heard the following relevant facts: Michael first met Hilary and 3-year-old C.M. in 1995 while photographing the pair at a J.C. Penney studio. They dated and later commenced living together in the spring of 1996. (N.T. 11.) Around that time, they learned Hilary was pregnant with A.L., who was born December 15, 1996. (N.T. 11.) According to Michael, the parties discussed Michael's adoption of C.M., but it never came to fruition. (N.T. 17.)

After A.L.'s birth, the four of them lived together for more than two years. (N.T. 13.) During this time, C.M. called Michael "dad," and referred to Michael's parents

as "grandma" and "grandfather." (N.T. 73, 104; defendant's exhibit 5.) Also during their cohabitation, Michael was recognized as C.M.'s father at family birthday parties, by kindergarten teachers and baby sitters. (N.T. 13.) C.M. has recognized Michael's family as part of his own family, and has spent time with them during vacations, holidays and birthdays. (N.T. 48.)

On June 8, 1997, C.M. and A.L. were baptized in the Roman Catholic Church. (N.T. 15, 56-57.) The baptisms were set up by Michael's parents, who are Catholic. Hilary, who is not Catholic, acquiesced to the baptisms. An original baptismal certificate named C.M.'s biological father as his father. According to Hilary, this greatly upset Michael, who was able to obtain a second certificate from the church indicating that he was C.M.'s father. (N.T. 58; plaintiff's exhibit 1.)

At some point after A.L. was born, Hilary began working full-time. Michael, who co-owned a photography business, worked there part-time and was also collecting partial unemployment compensation. (N.T. 28.) During the day, the children were generally cared for by a baby sitter, although, occasionally, Michael would watch them. (N.T. 30.) According to Michael, in October 1998, when the parties were having difficulties, Hilary asked, and Michael agreed, that he would act as C.M.'s father if they split up. (N.T. 17.)

In February 1999, the parties separated and Hilary took primary physical custody of both children. Michael, however, maintained regular contact with C.M. for the next three years, through February 24, 2002. (N.T. 62.) The parties agreed to an arrangement whereby Michael would

assume physical custody of C.M. whenever he had physical custody of A.L., usually on alternating weekends, as well as some holidays and vacations. (N.T. 18, 23, 62.) Michael provided almost all the transportation for these visits. (N.T. 64.)

On December 15, 2001, Hilary married her current husband, George.[1] By all accounts, C.M. has developed a positive and loving bond with George, whom he recently began to refer to as "Dad," and desires to be adopted by him. (N.T. 46-47, 56, 68, 94; George dep. at 7-8, 12; defendant's exhibit 5.) C.M. currently refers to Michael as "Mike." (George dep. at 51.) George testified that C.M. told him that Michael gets very upset at C.M. when he refers to George as his "dad." (George dep. at 16.) Hilary and George have had both C.M. and A.L. "dedicated" into their Baptist Church, which means they have pledged to raise the children in a Christian environment and as members of the church. (George dep. at 11.)

Michael's contact with C.M. ended abruptly on February 24, 2002, when, upon returning C.M. and A.L. to Hilary following weekend visitation, Michael was told by George that he was no longer welcome there. (N.T. 25, 74.) Hilary also refused to permit Michael to speak with C.M. on the phone. (N.T. 25, 76.) Hilary appears to have terminated contact upon learning that Michael per-

---

1. George is a sergeant in the Pennsylvania Army National Guard. He was stationed in Germany on June 25, 2002, and will be there for at least six months. As such, he provided testimony via a June 21, 2000 deposition. (Defendant's exhibit 4.) Hilary and George recently became parents to their own daughter, born June 11, 2002.

mitted his attorney to ask C.M. questions concerning custody issues. Prior to that, she let C.M. decide whether to visit Michael, and that, except for all but a few occasions, C.M. wanted to visit him. (N.T. 58, 63.) However, according to numerous accounts, the incident with the attorney appears to have had a great impact upon C.M., who felt pressured to answer questions and thereafter decided he no longer wanted to visit Michael. (N.T. 58; George dep. at 16; defendant's exhibit 5.) Hilary claims she will adhere to her son's wishes as to future visits with Michael. (N.T. 77.)

C.M.'s psychologist who began seeing him after February 24, 2002, reported that C.M. appeared ambivalent about resuming visitation with Michael, at one point reporting that he did not desire to visit, and at another, indicating resumed visitation would be okay with him. The psychologist reported that C.M. felt caught in the middle and pressured by all sides. She felt the matter was extremely stressful to him and that he felt he had jeopardized his status within his family (with his mother and stepfather). C.M. was particularly upset because he believed he had made Michael angry at him for having told his mother and stepfather about having talked to Michael's attorney. C.M. told the psychologist that Michael had set up the interview with the attorney because Michael was afraid of losing C.M. and his sister. (Defendant's exhibit 5.)

C.M. told me, in chambers, that he would like to visit with Michael if Michael did not lie or talk mean about his mother. He also indicated a desire to visit Michael so he can be with his sister. (N.T. 107-108.) C.M. parroted

his mother's accusations about Michael's lying, a reference to his bad check conviction and other incidents described below. (N.T. 106-108.)

Hilary presented evidence indicating her belief that Michael is not an appropriate role model for C.M. (N.T. 57.) She testified that when they lived together, Michael was not a productive member of the family, that there were periods when he was not available, including when running from constables and under arrest for bad check charges. (N.T. 51.) Michael previously pled guilty to passing bad checks before he met Hilary. (N.T. 35; defendant's exhibit 3.) In addition, both she and his former photography partner claimed that Michael had forged her name onto three of her checks which were written to his photography studio against her closed personal checking account. (N.T. 51-53, 88-89; defendant's exhibit 1.) She claimed he also pocketed money she gave him to pay for the children's baby-sitting when they were living together. She testified that while cleaning out his items following their separation, she found three trash bags full of pornographic material hidden in their home and in a shed. (N.T. 81.) Michael's photography partner confirmed that he had found pornographic materials in the same shed. (N.T. 89-90.) According to Hilary, Michael did not pay support for C.M. following their separation, although he offered to do so if she would allow him to adopt C.M. (N.T. 61.) George testified that when Michael had the children, he ran an undisciplined household and that they returned from visits exhausted and sometimes ill. (George dep. at 14-15.)

## LEGAL DISCUSSION

Hilary raises the following issues in her statement of matters complained of on appeal:

(1) To the extent that the court found Michael had standing to seek custody/visitation,

(a) Michael failed to establish that he acted in any significant way in the role of a substitute parent.

(b) Hilary's current husband has assumed the role of father to C.M.

(c) Michael has never become an integral part of C.M.'s life.

(d) Michael has sought to insinuate himself into the family relationship between Hilary, her husband and C.M., and has engaged in manipulation of C.M. to this end.

(e) Even if Michael stood in loco parentis to C.M. at one point, his status has been lost over time following the parties' separation.

(2) The evidence showed it was not in C.M.'s best interests to have any visitation with Michael because Michael has demonstrated an inability to manage his personal and business affairs, has manipulated C.M., has potentially exposed C.M. to an unhealthy environment such as pornographic materials, and has been unable to act as a positive role model for C.M.

(3) It is not in C.M.'s best interests to be forced to visit Michael.

(4) The court's order impermissibly intrudes on the family unit established by Hilary, her husband, C.M. and his half-sister A.L.

*Standing*

Since he is not C.M.'s biological parent, Michael is considered a "third party" for the purpose of pursuing this custody action. *T.B. v. L.R.M.,* 567 Pa. 222, 786 A.2d 913, 916 n.6 (2001). In order for a third party to pursue such an action, the party must have standing. Standing for a third party can exist only where the legislature has specifically conferred it, or where the party stands in loco parentis to the child. *Id.* "A determination of standing simply implies that the party has a substantial interest in the subject matter of the litigation and that the interest is direct, immediate and not a remote consequence." *Id.* at 919-20. Such a finding is not decisive as to the merits, but merely affords the moving party the opportunity to fully litigate the issue. *Id.*

Here, my ultimate finding, that Michael was entitled to visitation, presumed that he stood in loco parentis to C.M. The Supreme Court in *T.B. v. L.R.M., supra,* elaborated upon the legal requirements for establishing in loco parentis as follows:

"It is well-established that there is a stringent test for standing in third-party suits . . . for visitation or partial custody due to the respect for the traditionally strong right of parents to raise their children as they see fit. *R.M. v. Baxter,* 565 Pa. 619, 777 A.2d 446, 450 (2001). . . .

"The phrase 'in loco parentis' refers to a person who puts oneself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of in loco parentis embodies two ideas; first,

the assumption of a parental status, and, second, the discharge of parental duties. *Id.; Commonwealth ex rel. Morgan v. Smith,* 429 Pa. 561, 241 A.2d 531, 533 (1968). The rights and liabilities arising out of an in loco parentis relationship are, as the words imply, exactly the same as between parent and child. *Spells v. Spells,* 250 Pa. Super. 168, 378 A.2d 879, 882 (1977). The third party in this type of relationship, however, cannot place himself in loco parentis in defiance of the parents' wishes and the parent/child relationship. *B.A. and A.A. v. E.E.,* 559 Pa. 545, 741 A.2d 1227, 1229 (1999); *Gradwell v. Strausser,* [416 Pa. Super. 118, 126,] 610 A.2d [999,] 1003 [(1992)]." *T.B. v. L.R.M.* at 916-17. (footnote omitted)

Hilary contends that Michael did not adequately prove an in loco parentis relationship. Specifically, she claims he failed to establish that he acted in any significant way in the role of a substitute parent, or ever became an integral part in C.M.'s life. This assertion is contrary to the credible evidence. Between approximately the spring of 1996, through February 24, 2002, Michael both assumed a parental status and discharged parental duties. Beginning with the parties' cohabitation, through February of 1999, a period of approximately three years, the parties lived together with C.M., and later with A.L., as a family unit. C.M. referred to Michael as his "dad" and was treated by Michael's extended family as their own. Furthermore, Michael was recognized in the community and in his church as C.M.'s father. Following their separation, the parties agreed to continued contact between Michael and C.M., which occurred on a regular basis for another three years.

"An important factor in determining whether a third party has standing is whether the third party lived with the child and the natural parent in a family setting, irrespective of its traditional or nontraditional composition, and developed a relationship with the child as a result of the participation and acquiescence of the natural parent." *Bupp v. Bupp,* 718 A.2d 1278, 1281 (Pa. Super. 1998). The evidence revealed that Michael lived with C.M. in a family setting and established, with Hilary's acquiescence, a parental relationship with him. This court further notes that "where a petitioner who is not biologically related to the child, but has established a parent-like relationship with the child, seeks not to supplant the natural parent, but only to maintain his relationship with the child through reasonable visitation or partial custody, his burden to establish standing is easier to meet." *J.A.L. v. E.P.H.,* 453 Pa. Super. 78, 89, 682 A.2d 1314, 1320 (1996); see also, *Bupp* at 1281-82 ("where only limited custody rights are sought, the limited nature of the intrusion into the biological family must be considered in deciding whether standing has been made out.").

In the *Bupp* case, a case similar to the one sub judice, the Superior Court affirmed the trial court's decision to confer standing upon the former live-in-boyfriend of the biological mother. *Id.* Even though the boyfriend there had only lived with the child for one year, the boyfriend had been encouraged by the mother, and assumed and performed parental duties, such as helping raise, feed, and diaper the child, provided guidance to her, played with her, and treated and considered her the same as his natural daughter. Mother conceded she invited Bupp to

act as father and that her child referred to him as "Daddy." *Id.* at 1282. Here, the evidence of in loco parentis was even stronger, wherein Michael has developed and maintained a parental relationship with C.M. for approximately six years, including three years during which he lived with C.M. as part of a family unit.

Hilary next argues that Michael no longer stands in loco parentis since her current husband has assumed the role of father to C.M. and/or that the in loco parentis status has been lost over time following the parties' separation. The evidence did indicate that Michael's in loco parentis role has diminished while George's role has increased. Nevertheless, between the time of the parties' separation and February 24, 2002, Michael remained a consistent presence in C.M.'s life, *i.e,* stood in loco parentis, keeping C.M. on alternating weekends, holidays and vacations. To the extent that there has been a loss of Michael's in loco parentis status since February 24, 2002, it is solely because Hilary cut off all contact between he and C.M. "[A] biological parent's rights 'do not extend to erasing a relationship between her partner and her child which she voluntarily created and actively fostered simply because after the parties' separation she regretted having done so.'" *T.B. v. L.R.M.* at 919 (quoting *J.A.L. v. E.P.H.* at 92-93, 682 A.2d at 1322).

Finally, Hilary asserts that Michael has sought to insinuate himself into the family relationship between she, her husband and C.M., and has engaged in manipulation of C.M. to this end. This is not supported by the record, which indicated that at all times, Michael has sought only to keep the status quo, *i.e.,* a custody arrangement

whereby he would maintain visitation on alternating weekends plus some holidays and vacations.

Since Michael established that he assumed a parental status and discharged parental duties, with Hilary's consent, he stands in loco parentis to C.M. and therefore had standing to seek visitation.

### Child's Best Interests

This court's paramount concern and the polestar of our analysis in any custody case, is the best interests of the child. Deciding a child's best interests is to be made on a case-by-case basis, considering all factors which legitimately have an effect upon the child's physical, intellectual, moral and spiritual well-being. *S.M. v. J.M.,* 811 A.2d 621, 623 (Pa. Super. 2002). C.M.'s best interests will be served by continuing visitation with Michael, who has been a consistent and important parental presence in C.M.'s life for over six years, including during formative years (from the age of 3 1/2 to 9 1/2). Furthermore, C.M. has indicated he would like to visit with Michael so long as Michael does not lie or talk badly about his mother.[2] C.M. also desires to visit Michael so he can be with his sister A.L. during her visits with him. *McMillen v. McMillen,* 529 Pa. 198, 203, 602 A.2d 845, 847 (1992) (a child's preference, although not controlling, is an important factor to be carefully considered in determining the child's best interests).

---

2. The custody order entered requires that both parties refrain from making derogatory comments about each other in the presence of their children.

Hilary argues that the evidence showed it was not in C.M.'s best interests to have any visitation with Michael because Michael has demonstrated an inability to manage his personal and business affairs, has manipulated C.M., has potentially exposed C.M. to an unhealthy environment such as pornographic materials, and has been unable to act as a positive role model for C.M.

This court is unsure how Michael's management of his personal and financial affairs is relevant to this court's inquiry into whether it is in C.M.'s best interests to maintain visitation with Michael. There was no evidence presented as to how Michael's alleged failures have harmed or will harm C.M. Hilary's reference to Michael's manipulation of C.M. would appear to be a reference to Michael having had C.M. interviewed by his attorney. Beyond the fact that the interview took place, there is no evidence how this constituted manipulation. Clearly, this event upset Hilary and disturbed C.M. because of his mother's reaction. However, this incident, involving C.M. being asked a few questions by an attorney, was a one-time occurrence, motivated by Michael's desire to retain partial custody/visitation with C.M. There was no evidence of manipulation on Michael's part. As to the pornographic materials, we certainly do not condone possession of such materials, and they are clearly inappropriate for young children. Nevertheless, the evidence indicated the materials were adult pornography which had been hidden by Michael. There was no evidence that C.M. had or has access to such materials.

Finally, Hilary argues that the court's visitation order impermissibly intrudes on the family unit she has now

established with her husband, C.M. and his half-sister A.L. This court's initial inquiry and ultimate finding, that Michael stood in loco parentis, resolved this question in the negative. *J.A.L. v. E.P.H.* at 88-89, 682 A.2d at 1319-20 (while it is presumed that a child's best interest is served by maintaining the family's privacy and autonomy, that presumption must give way where the party seeking custody stands in loco parentis).

Accordingly, this court entered an order on July 16, 2002, granting Michael visitation rights.