689 A.2d 294

**In re K.C.W., K.O.W. and K.S.W., the minor children of K.R.W. and M.S.W., the minor child of M.S.W. and K.R.W.**

**Appeal of K.R.W.**

Superior Court of Pennsylvania.

Submitted Dec. 9, 1996.

Filed Feb. 5, 1997.

**4**

Carla J. Thomas, Easton, for appellant.

Vivian M. Appel, Bethlehem, for Guardian Ad Litem, participating party.

Roseann B. Joseph, Easton, for Northampton County Children and Youth Services, participating party.

Brian M. P. Monahan, Easton, for Maternal Grandmother, participating party.

Samuel P. Murray, Easton, for Natural Father, participating party.

Before CERCONE, President Judge Emeritus, and HUDOCK and EAKIN, JJ.

CERCONE, President Judge Emeritus:

Appellant mother, K.R.W., files this appeal from a decree terminating her parental rights to her four children.[1] We reverse.

Four of mother's children are the subject of this involuntary termination proceeding: K.C.W., who was nine years old at the time of trial, K.O.W. and K.S.W., twins who were five years old at the time of trial, and M.S.W., who was three years old at the time of trial. Preliminarily, we note that M.S.W.'s father, M.S.W., made no attempt to participate in the hearing regarding the petition to terminate his parental rights or to challenge the decree *nisi*. Nor is he a party to this appeal. The natural fathers of the remaining children have likewise made no attempt to participate in or object to these proceedings. Accordingly, that portion of the decree terminating fathers' rights is not before us. Grandmother, who was

---

1. Mother characterizes this action as an appeal from the order entered June 3, 1996, denying her exceptions to a decree *nisi*, which had been entered on April 1, 1996. We have been unable to discern from the record whether the decree *nisi* has been entered as a final decree. In the interest of judicial economy, however, we shall regard as done that which ought to have been done and proceed to the merits of this appeal. *See In re M.T.*, 414 Pa.Super. 372, 383–84, 607 A.2d 271, 277 (1992).

granted permission to intervene in the involuntary termination proceedings below, has not participated in this appeal.

On April 23, 1991, father attempted to hit mother but instead struck their seven week old son, who mother was holding at the time. Mother transported the child to the hospital where he was treated for a hematoma to the temple lobe. As a result of that incident, mother sought and obtained a Protection From Abuse order against Father. That order was vacated on May 1, 1991, once the parties reconciled.

The Northampton County Department of Human Services, Division of Children, Youth and Families (CYF) became involved with the family in May of 1991. The agency was initially contacted to investigate the allegation of abuse by father against M.S.W. N.T. 1/17/95 at 39. It then raised hygiene and safety concerns. Specifically, CYF objected to the presence of father, who had an alcohol problem and a violent and abusive temper. It also criticized the perceived lack of supervision by mother. The agency claimed that mother allowed the children to play in or near the street while she, or other adults, stood at too great a distance to intervene should the children attempt to enter the path of oncoming traffic. The street was actually an alley over which only one car could pass at a time. No case worker ever saw the children on the street when traffic was present. N.T. 1/17/95 at 64–68, 76, 89–95. By July, 1991, CYF noted improved supervision, acknowledging that the children were "well-supervised." N.T. 1/17/95 at 97–98. Dependency Hearing, 8/8/91, Findings of Fact 5–6. Similarly, the hygiene concerns were quickly redressed. Mother did not, however, exclude father from the children's environment. N.T. 1/17/95 at 40.

The agency initially contacted the Family Preservation Unit of Valley Youth House in May, 1991. The Family Preservation Unit provided a twelve week program. Case workers met with mother five times a week and noted mother's cooperation and improvements. N.T. 1/17/95 at 66; 1/18/95 at 7, 15, 39, and 42.

At times throughout these proceedings, mother lived in a four-bedroom home with the children's great-grandmother. Both appellant's grandmother ("great-grandmother") and mother ("grandmother") live on Spruce Street, separated by two or three houses. Also living with great-grandmother are mother's step-grandfather as well as mother's sister and her two children. Living with grandmother is mother's brother, L.W. Father lived with his own grandmother at 816 Spruce Street.

Mother filed a second Protection From Abuse petition against Father on June 20, 1991. On that same evening, father punched and bit mother. Although she consequently filed a petition for contempt against him, she failed to appear for a hearing to prosecute that contempt petition, declaring at trial that she was afraid father would have violently retaliated against her. The witnesses presented additional examples of father's violent temper and acts of vandalism against mother and grandmother and the couple's violent quarrels.

In August, 1991, CYF filed petitions to declare K.O.W., K.S.W., and M.S.W. dependent. N.T. 1/17/95 at 67–68, 95. Ultimately, all four children were found dependent. After conducting a dependency hearing, the master recommended that the family cooperate with Intensive Home Start Services. The master also recommended that father undergo drug and alcohol evaluation, obtain any recommended treatment, and refrain from contact with the children. At a dependency review hearing, the master concluded that father had violated the order. Moreover, mother had refused to cooperate with Intensive Home Start. Dependency Review Hearing, 9/19/91, Finding of Fact 5; N.T. 1/17/95 at 108. As a result, on September 9, 1991, the agency removed the children from their mother's care and placed them with grandmother. About one week later, the agency removed the children after having received a telephone call, ostensibly from grandmother, requesting their removal. Although grandmother denied making any such request, the children were placed in foster care.

On April 2, 1992, after a dependency review hearing, the master found that, since the children had been placed in foster care, mother had participated with Home Start Services and was working on parenting issues, the GED program, and locating housing. Dependency Hearing, 4/2/92, Finding of Fact 4. The master added a recommendation, that mother complete the New Horizons work training program and continue her search for appropriate housing. Mother appeared for all scheduled visits with the children. In addition, in October, 1991, mother, on her own initiative, sought parenting classes. N.T. 1/17/95 at 106. In May of 1992, mother sought and was granted shelter at the Easton YWCA. After a week, however, she was asked to leave the shelter because father had been found hiding in the closet of her room. N.T. 1/18/95 at 23–25.

In June of 1992, mother obtained a three bedroom apartment on Lincoln Street. The agency case worker described the Lincoln Street apartment as tidy and spacious. N.T. 2/10/95 at 8. While living on Lincoln Street, mother called the police on thirteen occasions to report father's unwanted presence. N.T. 1/19/95 at 93, 95. Mother was evicted on March 29, 1993 for non-payment of rent and returned to live with great-grandmother.

Between the April 2, 1992 and December 3, 1992 hearings, mother had been employed at times. Although she continued to cooperate with Home Start Services, on occasion, she was not receptive to its advice regarding childcare. Mother attended seven of eighteen counseling sessions through Turning Point to address the domestic violence issue, but did not complete the program because of transportation difficulties. Dependency Hearing, 12/3/92, Finding of Fact 4. The counselor acknowledged that mother was initially motivated but that her progress was thwarted by irregular attendance. N.T. 1/18/95 at 97.

At the June 3, 1993 dependency hearing, the master noted mother's lack of consistency in attending counseling sessions and corresponding lack of significant progress as well as her financial inability to keep the Lincoln Street apartment. On

June 16, 1993, in accordance with the master's recommendations, the court returned K.C.W. and M.S.W. to mother subject to conditions. Specifically, mother was admitted into the Family Preservation Program, which consisted of twelve weeks of free housing at New Bethany Shelter, case management and counseling. Participants were required to follow shelter rules, attending meetings and setting aside one-third of their earnings. N.T. 1/20/95 at 9. The children were returned to mother on the condition that K.C.W. continue with therapy and that mother refrain from any contact with father. N.T. 1/20/95 at 7–8. Mother was accused of having contact with father and asked to leave New Bethany. The children were therefore removed on July 8, 1993 and returned to foster care. N.T. 1/20/95 at 10. While at the shelter, however, mother had begun to make progress in parenting and anger management, had cooperated, and had otherwise complied with the shelter's rules. N.T. 1/18/95 at 62–69.

On July 15, 1993, the agency changed its goal from placement with mother to adoption and involuntary termination. Between July, 1993 and January 27, 1994, mother visited biweekly with her children in the agency offices. N.T. 1/20/95 at 19. Grandmother offered herself as an adoptive resource but failed to complete the adoptive home study.

On April 15, 1994, CYF filed a petition to terminate the parental rights of mother and the fathers. From July, 1994 to October, 1994, mother resided with great-grandmother. In October, 1994 she was imprisoned for failing to pay support. She was released in February, 1995, and has since made approximately three support payments.

After presiding over a non-jury trial, the lower court, on April 1, 1996, entered an adjudication and decree *nisi* terminating the rights of all parents. Mother filed timely exceptions, which were denied by order dated June 3, 1996. In the instant appeal, mother claims that the court's decision to terminate her parental rights lacked sufficient evidentiary support.

■ When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the court below was supported by competent evidence. *Commonwealth v. Arnold,* 445 Pa.Super. 384, 389, 665 A.2d 836, 838 (1995). Absent an abuse of discretion, an error of law or insufficient evidentiary support for the chancellor's decision, the decree must stand. *Id.* The trial court is free to believe all, part, or none of the evidence presented. *In re Diaz,* 447 Pa.Super. 327, 332, 669 A.2d 372, 375 (1995). Further, the trial court, as the trier of fact, makes credibility determinations and resolves conflicts in the evidence. *Id.* The party seeking termination bears the burden of establishing by clear and convincing evidence that grounds exist for doing so. *Arnold,* 445 Pa.Super. at 389, 665 A.2d at 838; *T.J.B. v. E.C.,* 438 Pa.Super. 529, 543, 652 A.2d 936, 944 (1995) (recognizing the constitutional significance of the rights involved in a termination of parental rights case). "Clear and convincing" evidence consists of testimony "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *T.J.B.,* 438 Pa.Super. at 543, 652 A.2d at 944 (quoting *In re Atencio,* 539 Pa. 161, 166, 650 A.2d 1064, 1066 (1994)).

■ In this case, the agency based its petition on the following statutory grounds:

(a) General Rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the condi-

tions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child. 23 Pa.C.S.A. § 2511(a)(1), (5). We shall begin by determining whether the agency presented clear and convincing evidence of the statutory requirements for termination under subsection (a)(1).

That subsection requires a showing of both a six-month period of estrangement and either a settled purpose or intent to relinquish a parental claim or a failure to perform parental duties. *Adoption of M.S.*, 445 Pa.Super. 177, 183, 664 A.2d 1370, 1373 (1995). Preliminarily, we note that a parent who fails to meet parental obligations for a six-month period does not automatically forfeit parental rights. *Arnold*, 445 Pa.Super. at 390, 665 A.2d at 839. Rather, when a petitioner alleges that a parent has failed to perform parental duties or has evidenced a settled purpose of relinquishing parental claim to the child for a period of at least six months immediately preceding the filing of the petition, the court must examine the individual circumstances and any explanations offered by the parent to determine if, in light of the totality of the circumstances, the evidence clearly warrants the involuntary termination of parental rights. *Id.*[2]

To that end, the court must consider the barriers faced by parents to exercising their parental rights. *Id.* The

---

**2.** The legislature amended section 2511(a)(1), effective date July, 1992, to require the court to focus on the six month period immediately preceding the filing of the termination petition. Before the amendment, the court considered whether the evidence established that the parent failed to perform parental duties or evidenced a settled purpose of relinquishing a parental claim to the child for a period of six months, without reference to the initiation of that period. Because the underlying petition was filed on April 15, 1994, well after the effective date, we shall apply the statute as amended.

parent must exhibit reasonable firmness in attempting to overcome the barriers or obstructive behavior of others. *Id.* (citing *Adoption of Baby Boy A. v. Catholic Social Services,* 512 Pa. 517, 521–23, 517 A.2d 1244, 1246 (1986)). Only after the court has determined that the requirements for involuntary termination under section 2511(a) have been satisfied will it inquire as to the needs and welfare of the child." *In re E.S.M.,* 424 Pa.Super. 296, 304, 622 A.2d 388, 392 (1993). *See* 23 Pa.C.S.A. § 2511(b) ("The court in terminating the right of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent").

In this case, CYF filed its petition to terminate the parental rights of mother and fathers in the children on April 15, 1994. As such, we must focus our inquiry on the six months preceding that action, *i.e.,* from October, 1993. At the hearing, CYF presented substantial evidence regarding the history of these proceedings. Evidence regarding the critical period from October of 1993, however, was meager.

On July 15, 1993, the agency changed the goal from placement with mother to adoption and involuntary termination. Head Start services were discontinued shortly thereafter, in November of 1993. Upon withdrawal, Head Start reasoned that mother continued to maintain a relationship with father, lost her housing and was uncooperative. Although they found that mother had responded well, they concluded from her relationship with father that she had made no real progress. Head Start also pointed to the unresolved issues of housing and mother's low self-esteem. Head Start Summary of Involvement dated November 15, 1993. The agency appeared to have relied on these factors as evidence of mother's failure to perform parental duties. We cannot agree that these factors amount to clear and convincing evidence of a settled purpose or intent to relinquish a parental claim or a failure to perform parental duties.

12

We shall initially address the issue of housing. The agency had objected to mother's residence with either grandmother or great-grandmother primarily on the basis of the proximity of those homes to the home of father and father's family. According to the evidence adduced at trial, however, father and most of his brothers no longer live on Spruce Street. N.T. 3/15/95 at 215–17. The agency additionally believed that great-grandmother's home would be too crowded. According to the testimony presented, mother was free to live with either great-grandmother or grandmother. Only one other adult, the children's uncle, lived with grandmother.

With regard to the "unresolved" issue of self-esteem, we note that as a matter of policy the agency, once the goal is changed to adoption, stops providing services to parents and stops suggesting that the parents seek services themselves. N.T. 1/20/95 at 43. Nevertheless, mother in this case sought counseling from her minister. She had previously been an active member of the church and had brought K.C.W. and the twins to church nearly every Sunday for service and religious instruction. N.T. 3/14/95 at 202. She also sought advice from Lucille Moore, a foster parent for the Children's Home in Easton who was the widow of her previous minister and who had taught her Bible classes. Mother sought advice from Ms. Moore about changing her life for the better and about the foster care system. N.T. 3/15/95 at 49–52. Ms. Moore testified that over the past year, mother had returned to the church. She characterized mother as behaving with more maturity in the last year than at any time in the past. N.T. 3/15/95 at 55. Further, Ms. Moore noted that mother now appears to realize that change has to come from within and that others are not at fault for failing her. N.T. 3/15/95 at 55–56.

We also emphasize that in January of 1994, father was placed in jail. The agency did not present any evidence of mother's continued contact with father from January, 1994 onward. Nor did the agency present any evidence with regard to father's release. All parties concede that mother regularly visited her children throughout this process.

As directed, we additionally consider the efforts made by mother since the agency became involved with the family to resist father's abusive influence and to overcome the barrier he presented to her attempt to regain custody. We cannot accede to the trial court's implication that mother was a willing participant who could have ended the "relationship" with father at any time.[3] Mother made repeated efforts to extricate herself from father's influence. She obtained two Protection from Abuse Orders against father. She also filed a petition for contempt of one of those orders, though she did not pursue that petition because she feared retaliation. In addition, mother made numerous calls to the police in response to father's presence. She moved from her Spruce Street home to at least two shelters. Although she attended some counseling sessions for women in abusive relationships, she did not complete the program, in part, because she did not see its merit. Her brother, a mental health worker for a youth crisis center, acknowledged that mother had been under father's controlling influence. Accordingly, mother continued to return to father, explaining at times, that she felt sorry for him and wanted to help him obtain drug and alcohol counselling. Father beat mother after attending one such counselling session with her. In light of the abusive nature of the relationship, we cannot agree that mother failed to exercise reasonable firmness in attempting to overcome father's obstructive behavior.

After conducting an extensive review of the record, we find that the agency failed to present clear and convincing evidence

3. Mother's situation bears similarities to that of a battered woman. "A battered woman is a woman who is repeatedly subjected to any forceful physical or psychological behavior by a man in order to coerce her to do something he wants her to do without any concern for her rights." *Commonwealth v. Stonehouse,* 521 Pa. 41, 61–62, 555 A.2d 772, 783 (quoting Walker, *The Battered Woman,* at xv (1979)). "Researchers have suggested that the psychological effects of the battered woman syndrome can be compared to classic brainwashing. These effects include fear, hyper-suggestibility, isolation, guilt, and emotional dependence, which culminate in a woman's belief that 'she *should not* and *can not* escape.' " *Id.* at 62 n. 6, 555 A.2d at 783 n. 6 (citation omitted) (emphasis in original). Battered women "feel incapable of reaching out for help...." *Id.* at 63 n. 9, 555 A.2d at 783 n. 9.

that, for the six month period immediately preceding the filing of the petition, mother evidenced a settled purpose of relinquishing parental claim to her children or refused or failed to perform parental duties. *Compare In Interest of Q.J.R.*, 444 Pa.Super. 460, 461–62, 467, 664 A.2d 164, 166–67 (1995), *appeal denied,* 544 Pa. 612, 674 A.2d 1074 (1996) (CYS removed mother's "crack baby" from the home after mother, a drug addict, failed to perform essential parenting skills, including providing adequate food and clothing, caring for the children and being present in the home; the court concluded that the evidence supported involuntary termination under subsection (a)(1)): (1) mother visited the child only 16 times over a two year period, and, for nearly fourteen months preceding the filing of the termination petition, had no contact with child, (2) mother provided minimal cooperation with the agency, and (3) mother was discharged from drug and alcohol treatment programs for non-compliance).

We must additionally determine whether the agency presented clear and convincing evidence of the statutory requirements for subsection (a)(5). Again, the petitioner must prove each of the elements of that subsection by clear and convincing evidence. *In re Adoption of Steven S.*, 417 Pa.Super. 247, 252, 612 A.2d 465, 467 (1992), *cert. denied,* 510 U.S. 866, 114 S.Ct. 187, 126 L.Ed.2d 145 (1993).

The agency removed the children in this case in response to safety concerns. Specifically, the agency noted father's abusive behavior toward mother and its concern about allowing the children to remain in such a dangerous environment. Further, the agency cited instances of the children's playing near or in the street by their home as evidence of inadequate supervision. It also criticized mother's failure to cooperate with Home Start.

As stated, by July of 1991, the agency acknowledged improved supervision. Moreover, although mother proved unable to extricate herself from her relationship with father, by January of 1994, he was unequivocally removed from the children's environment when he was placed in jail. Again, we

stress that mother is free to live with either great-grandmother or grandmother. Only one other adult, the children's uncle, lives with grandmother. Further, as stated, the main objection to that housing, its proximity to father and father's family, was no longer relevant at the time of of the hearing. Accordingly, we cannot "come to a clear conviction, without hesitancy," that the conditions leading to the removal of the children continue to exist. *See T.J.B., supra.* As such, the agency failed to present clear and convincing evidence of each of the statutory requirements for termination under subsection (a)(5). *Compare Diaz,* 447 Pa.Super. 327, 669 A.2d 372 (CYS took physical custody of an infant after observing her unsafe and unsanitary living conditions, *i.e.,* animals and animal feces were in the home, a dog was lying on the 3--week old child, and at least one window was broken; the court adjudicated the child dependent and explained that mother, to regain the child had to obtain clean and stable housing, lead a drug free lifestyle, improve her knowledge of child development and parenting skills and find acceptable caretakers for the child in her absence; the agency satisfied the conditions for involuntary termination of parental rights under subsections (a)(1) and (5): mother moved several times; visited only four times in an approximately two year period, and failed to follow through with agency referrals to counseling programs).

After careful review, we conclude that the agency has failed to sustain its burden of proving by clear and convincing evidence the statutory grounds for terminating appellant mother's parental rights under either subsection (a)(1) or (5).

Order reversed.