J-S24043-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF L.M.W. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: S.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1912 WDA 2016 |

Appeal from the Decree November 17, 2016
In the Court of Common Pleas of Armstrong County
Orphans' Court at No(s):  No. 13 of 2016

| | | |
|---|---|---|
| IN RE: ADOPTION OF S.A.D. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: S.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1913 WDA 2016 |

Appeal from the Decree November 17, 2016
In the Court of Common Pleas of Armstrong County
Orphans' Court at No(s):  14 OF 2016

BEFORE:   PANELLA, STABILE, JJ., and STEVENS, P.J.E[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED APRIL 21, 2017**

S.W. ("Mother") appeals from the decree entered in the Court of

Common Pleas of Armstrong County, terminating her parental rights to her

two daughters, L.M.W. (d.o.b. 12/25/2012), and S.A.D. (d.o.b. 8/13/2015)

---

[*] Former Justice specially assigned to the Superior Court.

("Children"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1) and (5), and (b). For the following reasons, we affirm.

In its Pa.R.A.P. 1925(a) opinion, the trial court summarized the history of the case as developed at Mother's Involuntary Termination/Permanency Hearing of November 17, 2016.

1. Mother is the biological mother of the subject Children [ ].

2. S.A.D. currently is enrolled in Kindergarten. L.M.W. is enrolled in preschool.

3. Mother and Father have a long history of drug use. Mother's history involves the use of heroin, crystal methamphetamine, and marijuana.

4. In or about June 2015, CYF became involved with the family because of Mother's drug use, at which time she did not want to enter treatment. The Children were not put into placement, but went to live with Father's mother, Lara Cravenor ("Paternal Grandmother").

5. At some point between June 2015 and August 2015, Mother and Father absconded with the Children from Pennsylvania to California because of outstanding arrest warrants related to their drug use.

6. The Children were put into placement in California for a brief period before Mother and Father were extradited back to Pennsylvania on August 12, 2015. The Children then entered placement in Pennsylvania on August 13, 2015, where they have remained to date.

7. A shelter hearing was conducted on August 31, 2015. An adjudication hearing followed on September 11, 2015, after which the Children were adjudicated dependent. Mother and Father were present for both hearings.

8. CYF did not have any contact with Mother after the adjudication hearing until October 22, 2015, when the caseworker assigned to the Children, Diane Whittaker, (["Whittaker"]), went to the Armstrong County Jail to visit Mother. At that meeting, Whittaker told Mother that the Children were placed into care and that CYF had established a concurrent placement goal of adoption. Whittaker further advised Mother that if the Children could not be returned home for any reason, CYF would pursue adoption.

9. Whittaker also presented Mother with her permanency plan, which included the following elements: 1) completing mental health treatment; 2) completing drug and alcohol treatment; 3) obtaining stable housing; [and] 4) [] complying with any criminal penalties or sanctions.

10. While incarcerated, Mother could call the Children up to one time per week, but it is not clear how often this actually occurred. Mother last had any contact with the Children on December 25, 2015. She spoke to them that day by telephone. . . .

11. Mother remained incarcerated until January 26, 2016, at which point she completed the incarceration portion of her sentence and was released on probation to attend drug and alcohol treatment.

12. After her release, Mother attempted to contact the Children by telephone at Paternal Grandmother's house. The first time she called, Paternal Grandmother told her that the Children were sleeping. Mother called several more times immediately after her release and left messages, but none were returned. She claims that she had a working telephone and valid number, but Paternal Grandmother indicated to CYF that mother did not leave a return number at which she could be reached.

13. Mother then moved to Allegheny County to live with a paramour, Justin Walker. Her probation supervision was

transferred to Allegheny County [after February 22, 2016, when Mother first notified CYF of her move]. Mother resided in Allegheny County until June 18, 2016, when [she and Walker were arrested on drug charges,] her probation was revoked and she was re-incarcerated

14. From January to June 2016, Mother did not enter drug and alcohol treatment, did not secure adequate housing, and did not seek any mental health treatment. She had no contact with the Children and admits to using drugs during the entire period. She claim[ed at her termination hearing of November 17, 2016,] that she could not do any visitation with the Children at this time because she did not have transportation to Armstrong County. She did not contact her court-appointed counsel during this period and only spoke with CYF on a few occasions. Mother admit[ted] that she did not contact CYF because she was using drugs.

***

16. After Mother's probation was revoked, she was reincarcerated until August 3, 2016, when she again was placed on probation. She then entered drug and alcohol treatment at ARC Manor, which was court-ordered as a condition of probation. Mother voluntarily terminated the treatment, allegedly because a worker at ARC Manor made sexual advances toward her. Upon leaving treatment, Mother again was arrested and incarcerated on or about August 17, 2016, for violating the terms of her probation.

17. Prior to Mother's leaving treatment at ARC Manor, Whittaker met with her at ARC Manor to advise of upcoming permanency hearings and that CYF intended to move forward with the adoption permanency goal. At the end of the meeting, Mother asked if she could visit with Children. Whittaker told Mother that she could set up a 30-minute visit the following week. This visit did not occur[, as Mother voluntarily terminated her treatment].

18. CYF filed the instant petitions to determine involuntary termination of parental rights on September 9, 2016.

19. Mother remained incarcerated until October 5, 2016, when she again was released and ordered to enter drug and alcohol treatment. Mother entered treatment at Cove Forge Behavioral Health in Williamsburg, PA, which she completed on November 11, 2016. During this period of treatment, Mother attended a chemical dependency group, a mental health group, and other activities. She also attended AA and NA meetings and was taught relapse prevention strategies. Upon her discharge, Cove Forge Behavioral Health recommended that she continue treatment in halfway house placement for 90 days.

20. Mother then was admitted to Cove Forge Renewal Center. The Renewal Center is a halfway house for women in recovery. Mother's counselor, Amy Minor, indicates that Mother has a "positive attitude and a willingness to learn." Mother's treatment program will include coping skills, mental health treatment, independent living skills, and parenting classes that Mother has requested. Mother does not yet have a set discharge date.

21. The halfway house program will last for at least 90 days, or until February 2017. If Mother successfully completes the program in that period, she will then be discharged. She will continue to require treatment, and the Children will remain in placement after that point. Whittaker indicated that, assuming that Mother is discharged from Cove Forge in February 2017, it would be at least another six to 12 months before CYF would consider reunification.

22. Mother has approximately one year remaining on her current probation sentence.

23. The Children currently are thriving and are well-adjusted to living with Paternal Grandmother. They do not have any special needs or developmental delays, and S.A.D. is doing very well in school.

> 24. CYF, Father, and the Guardian *ad Litem* agree that termination of Mother's parental rights are in the Children's best interest.

> 25. Paternal Grandmother intends to seek adoption of the Children.

Trial Court Opinion, filed 12/28/2016, at 1-7.

By the Court's decree of November 17, 2016, it terminated Mother's parental rights pursuant to the Adoption Act, as noted, *supra*. This timely appeal followed.

Mother presents the following questions for our review:

> I. **WHETHER THE TRIAL COURT ERRED WHEN IT FOUND THAT THE EVIDENCE PRESENTED BY APPELLEE CLEARLY AND CONVINCINGLY ESTABLISHED GROUNDS FOR INVOLUNTARY TERMINATION OF PARENTAL RIGHTS UNDER 23 PA.C.S § 2511(A)(1)?**

> II. **WHETHER THE TRIAL COURT ERRED WHEN IT FOUND THAT THE EVIDENCE PRESENTED BY APPELLEE CLEARLY AND CONVINCINGLY ESTABLISHED GROUNDS FOR INVOLUNTARY TERMINATION OF PARENTAL RIGHTS UNDER 23 PA.C.S. § 2511(A)(5)?**

Appellant's brief at 5.[1]

---

[1] In Mother's court-ordered Pa.R.A.P. 1925(b) statement, she raised an additional issue asserting that the trial court inadequately considered the parent-child bond existing between Mother and her children, as was required by 23 Pa.C.S. § 2511(b). Mother, however, fails to raise this issue in her statement of questions presented. We could consider Mother's challenge to Section 2511(b) waived. **See Krebs v. United Refining Company of Pennsylvania**, 893 A.2d 776, 797 (Pa.Super. 2006) (stating that, a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues).
*(Footnote Continued Next Page)*

Our standard of review is as follows:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.,* 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve

*(Footnote Continued)* _____

In *In the Interest of T.L.B.,* 127 A.3d 813 (Pa.Super. 2015), however, this Court declined to find that the appellant had waived an issue, where it could have been stated with more specificity, and the court opinion aptly addressed the issue. *Id.,* at 817 (citing *Commonwealth v. Laboy*, 936 A.2d 1058, 1060 (Pa. 2007) (declining to find waiver for failure to adequately develop a sufficiency of the evidence claim)). We, too, decline to find waiver, for Mother included the Section 2511(b) issue in her Pa.R.A.P. 1925(b) statement, the trial court addressed the issue in its responsive Pa.R.A.P. 1925(a) opinion, and Mother raises the issue, albeit summarily, within her Issue II argument pertaining to Section 2511(a)(5).

errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73–74 (Pa.Super. 2004) (citations omitted).

The Court's review in a termination of parental rights case begins with an inquiry into the parent's conduct. *In re R.J.S.,* 901 A.2d 502, 508 (Pa. Super. 2006). This inquiry is governed by 23 Pa.C.S.A. § 2511(a), which provides, in pertinent part:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

...

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

***

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(1) and (5).

Once the court has determined a statutory ground for termination has been established, the court focuses on the child's needs and welfare, as set forth in Section 2511(b):

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

> It is well established that:
>
> Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, that court has held that the parental obligation is a positive duty that requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

*In re B., N.M.,* 856 A.2d 847, 855 (Pa.Super. 2004) (emphasis added).

The petitioner has the burden of showing by clear and convincing evidence that a statutory reason for termination exists. *Santosky v. Kramer*, 455 U.S. 745 (1982). In order to affirm the termination of parental rights, this Court need only agree with any one subsection of

- 9 -

Section 2511(a), in addition to subsection (b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

In Mother's first issue, she claims that the evidence failed to make the requisite Section 2511(a)(1) showing that she had either evidenced a settled purpose of relinquishing her parental claim or refused or failed to perform parental duties. We disagree.

At her termination hearing of November 17, 2016, Mother asserted that the obstructive actions of Paternal Grandmother, in her capacity as children's custodial caregiver, amounted to the type of willful and intentional foiling of a mother-child connection that precludes a court from terminating parental rights. She accused CYF, as well, for encumbering her in her efforts to see her children, as the agency allegedly disregarded her accusations against Paternal Grandmother, failed to coordinate workable visitation dates, and refused to accommodate her inability to obtain transportation out of Allegheny County. The trial court, however, found no merit to her claims.

In the present appeal, she attempts to advance this theme by citation to the record and reliance on authority prohibiting termination "where a parent through no fault of [her] own, was unable to sufficiently exercise [her] parental rights due to barriers being placed in [her] way by others, including the agency." Appellant's brief at 9 (citing *In re Baby Boy H.*, 585 A.2d 1054 (1991)).

Our Court has stated:

Where a non-custodial parent is facing termination of his or her parental rights, the court must consider the non-custodial parent's explanation, if any, for the apparent neglect, including situations in which a custodial parent has deliberately created obstacles and has by devious means erected barriers intended to impede free communication and regular association between that non-custodial parent and his or her child. **Although a parent is not required to perform the impossible, he must act affirmatively to maintain his relationship with his child, even in difficult circumstances. A parent has the duty to exert himself, to take and maintain a place of importance in the child's life. Thus, a parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment. A parent cannot protect his parental rights by merely stating that he does not wish to have his rights terminated.**

*Id.* at 855–86 (emphasis added) (citation omitted). Additionally, "the court must consider the barriers faced by parents to exercising their parental rights. [However, t]he parent must exhibit reasonable firmness in attempting to overcome the barriers or obstructive behavior of others." *In re K.C.W.,* 689 A.2d 294, 299 (Pa.Super. 1997).

After a five-month incarceration, Mother gained her release from county jail on January 26, 2016. She testified that she telephoned Paternal Grandmother "after a few days" to check on the children only to have Paternal Grandmother claim the children were sleeping. Mother, however, said she could hear the children laughing and playing in the background. Nevertheless, she chose not to press the issue and decided to call the next day. N.T. at 41.

- 11 -

According to Mother, she received no answer to her call on the next day. *Id*. She placed "multiple" phone calls thereafter, she maintained to the trial court, but she kept no record of her calls. *Id*. Mother also indicated that the CYF Caseworker Whittaker doubted her reported complaint against Paternal Grandmother. N.T. at 41-42. It was Whittaker's testimony that Paternal Grandmother had received only one phone call from Mother, on February 2, 2016, who asked only for a W-2 form without ever asking about the children. N.T. at 30.

Whittaker testified that Mother first telephoned her on February 22, 2016, 27 days after being released from jail. CYF had been unable to locate her, and it was not until the phone call that Mother revealed to the agency that she was residing forty miles away in Pittsburgh with her boyfriend. N.T. at 31.

According to Whittaker, Mother never asked to visit the girls, and "in fact, said she didn't plan to visit them[]"and hung up the phone after Whittaker had broached the subject. N.T. at 31. Likewise, Mother failed to ask about the children in the only other phone call between the two, Whittaker testified. *Id*. Whittaker testified that she reminded Mother about available "visit coaching" and gave her the phone number to make an appointment, but Mother never called. *Id*.

The record, therefore, established that Mother stayed with her paramour in Pittsburgh until her June, 2016, arrest on drug charges. During the five-month period between incarcerations, Mother sought no contact

with Children, and she would later admit to avoiding contact with CYF because she was using drugs, namely, heroin, crystal meth, and marijuana. N.T. at 12, 47, 49. The few times CYF managed to contact Appellant, she failed to ask about the Children and disregarded advice regarding parenting services and programs available to parents in drug and alcohol treatment. At the time of her June, 2016 arrest, Mother had not physically parented her children for one year. N.T. at 21.

From this evidence, the trial court determined that neither Paternal Grandmother nor CYF prevented Mother from gaining access to her children. We agree, as the record demonstrates not a third-party obstruction of the parent-child relationship but, instead, Mother's own volitional abandonment of her children.

Even if Mother did experience some difficulty in contacting Children, her established pattern of behavior during the relevant period reveals that she made no affirmative attempt to overcome such difficulties for the sake of renewing and maintaining a relationship with her children. At best, it may be said of Mother that she failed to exhibit the reasonable firmness required of a parent who claims others impeded access to her children.

In that regard, Mother does not present as the parent who, through no fault of her own, could not contact her children. Indeed, Mother likens her experience to that of the father in **Baby Boy H.**, who confronted far more challenging impediments such mother's false claim of miscarrying, followed by questions as to paternity. Here, after, at most, a few failed phone call

- 13 -

attempts, Mother made no meaningful effort to reestablish contact with her daughters. Accordingly, we find no merit to Mother's Section 2511(a)(1)-based challenge.

In Mother's second issue, she contends the evidence failed to prove that she cannot or will not remedy within a reasonable amount of time the conditions that led to the placement of her children, as required by Section 2511(a)(5). Because we have determined that a statutory reason for termination existed under Section 2511(a)(1), we need not address this issue. *See In re B.L.W.*, *supra*.

Even if we were to assess the propriety of termination of Mother's rights under Section 2511(a)(5), we would affirm on that basis, as well. Specifically, Appellant argues that termination was improper because she was successfully participating in a 90-day in-patient drug and alcohol treatment program at the time. Within the text of her argument on this issue, moreover, Mother also baldly asserts a Section 2511(b) argument that the trial court failed to explore sufficiently the special bond existing between herself and her children.

On September 11, 2015, Mother attended an adjudication hearing at which the court placed her children in the care of Paternal Grandmother. On October 22, 2015, Whittaker visited Mother at the jail and conducted what she termed a "full disclosure meeting," in which she explained to Mother that CYF had developed both a permanency plan for Mother to follow in order to reunify with her children and a concurrent goal of adoption for the children

should CYF conclude that it could not return the children home for whatever reason. N.T. at 14-15. Therefore, Mother knew at the outset that she risked losing her children to adoption if she faltered under the permanency plan. N.T. at 15.

The CYF permanency plan required Mother to obtain, *inter alia*, mental health treatment, drug and alcohol treatment, and, after serving out her jail and probationary sentences, stable housing. N.T. at 15. Mother, however, sought no treatment at Armstrong County jail during her three-month incarceration there. Upon her January 26, 2016, release, Mother did not report her whereabouts until February 22, 2016, when she telephoned from Allegheny County indicating that she was living with her boyfriend. On March 7, 2016, Mother alluded to an upcoming evaluation at Pyramid, a drug and alcohol facility. N.T. at 18. However, Pyramid never submitted a report indicating that Mother attended.

The next time the Whittaker received word regarding Mother was when she learned Mother had been arrested in Pittsburgh in June of 2016 on drug charges. Mother's probation was revoked for her failure to meet with her probation officer, and she was reincarcerated at Armstrong County jail. During her incarceration, a CYF supervisor advised her of the "Family Links" program, which provided an opportunity for Mother to reconnect with her children if she progressed in the program. N.T. at 49. Mother opted against enrolling. *Id*.

Mother was released on August 3, 2016, under court order to attend drug and alcohol treatment at ARC Manor in Kittanning. N.T. at 43-44. In Mother's own words, however, she made the "impulsive" decision to leave the treatment center after only a few days, claiming that a counselor had made sexual advances toward her. N.T. at 44. She reported to Whittaker hours later, but authorities arrested her and returned her to county jail, where she remained until October of 2016. N.T. at 45.

On September 9, 2016, CYF filed its petition for involuntary termination of Mother's parental rights. At that time, Children had been in placement for 15 months. One month later, Mother entered a drug and alcohol treatment center at Cove Forge Renewal Center, where she resided from October 5 to November 11, 2016.

For the first year of her permanency plan, therefore, Mother sought no mental health or drug and alcohol treatment, obtained no suitable housing, violated the terms of her probation twice, and was incarcerated on three separate occasions. N.T. at 22. During the same time span, she spoke to her children just once, by telephone on Christmas Day. Indeed, Mother admitted she had been using heroin and other drugs from January through June of 2016 with her live-in boyfriend, and she did not contact CYF for this reason. N.T. at 20, 47, 49.

Although Mother had, by the time of the termination hearing, completed five weeks of drug and alcohol rehabilitation, it was undisputed that she would not be eligible for discharge until she completed an additional

three months of rehabilitation without any findings of noncompliance. Furthermore, Mother would have remained on probation and been required to obtain suitable housing in the meantime.

According to Whittaker, even if Mother achieved all her goals at such point without fail, CYF policy would have permitted return of Children to Mother no sooner than six months after her discharge from rehabilitation, a date which roughly coincided with Children's two-year placement anniversary. Given this history, we discern no error with the court's determination that petitioner proved by clear and convincing evidence Mother's inability to remedy the conditions that led to placement of her children within a reasonable amount of time.

As addressed *supra*, within Mother's argument in support of her Section 2511(a)(5) issue, Mother included two sentences charging the court with conducting an inadequate Section 2511(b) Parent-Child bond assessment in the present matter. The sum of Mother's argument in this regard is as follows:

> Additionally, [Mother] had developed a special bond between herself and her children over the course of the first few years of the children's lives. This bond was not thoroughly explored by the trial court in order to determine the extent of said parent-child bond.

Appellant's brief at 12.

Mother offers no detailed discussion of this issue and cites to neither the certified record nor relevant authority to support her otherwise bare assertion. Accordingly, we find Mother's issue waived for briefing

deficiencies. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (quoting *In re A.C.*, 991 A.2d 884, 897 (Pa. Super. 2010)) ("'[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.'").

Even if we were to review this issue on its merits, we would discern no merit to it. Only if the trial court determines that a parent's conduct warrants termination under Section 2511(a) does the court engage in an analysis of the best interests of the child under Section 2511(b). *In the Interest of B.C.,* 36 A.3d. 601 (Pa.Super. 2012). This Court has explained our analysis with respect to Section 2511(b) in the following manner:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

- 18 -

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Moreover, our Supreme Court has observed: "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268 (citation omitted). The *T.S.M.* Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The Court recognized that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail ... the result, all too often, is catastrophically maladjusted children." *Id. See also In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")

Contrary to Mother's assertion, there is no evidence of record that a parent-child bond exists between Mother and Children, who were four and two years old, respectively, when they were placed with Paternal Grandmother over 17 months prior to the termination hearing. Therefore, it was reasonable for the trial court to infer that no bond existed. *See In re*

***K.Z.S.***, 946 A.2d at 762–63 (allowing for inference of no bond where evidence of bond was absent).

Furthermore, though the trial court did not discredit Mother's expression of love for her children, we have explained that a "parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." ***In re Z.P.***, 994 A.2d at 1121. This Court has stated: "[A] parent's basic constitutional right to the custody and rearing of ... her child is converted, upon the failure to fulfill ... her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." ***In re B.,N.M.***, 856 A.2d at 856 (internal citations omitted).

Moreover, Caseworker Whittaker testified that both girls were doing very well in Paternal Grandmother's home. N.T. at 8-10. The girls were developmentally on target, received all of their medical treatment and care, and were doing well in kindergarten and Headstart, respectively. N.T. at 10. From this evidence, the Court discerned that Children were bonded to the Paternal Godmother, who remains the presumptive adoptive parent.

It is in the children's best interest to sever the parent-child relationship in this unfortunate case. These children require permanency and a healthy environment, which only Paternal Grandmother has provided them so far in their young lives. Because Mother has proven incapable of providing such a setting for her children, the court committed no error in terminating Mother's parental rights.

Decree Affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/21/2017